**ROGERS RADIO COMMUNICATION SERVICES, INC., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**American Telephone and Telegraph Co. & Illinois Bell Telephone Co., National Association of Radiotelephone Systems, Intervenors.**

**TELOCATOR NETWORK OF AMERICA, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**AT&T Company and Illinois Bell Telephone Company, Intervenors.**

**Nos. 77–1352, 77–1357.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 14, 1978.

Decided Dec. 19, 1978.

---

Kenneth E. Hardman, Washington, D. C., with whom Abe Fortas, Jeremiah Courtney, and Arthur Blooston, Washington, D. C., were on the brief, for appellants.

C. Gray Pash, Jr., Counsel, F. C. C., Washington, D. C., with whom Daniel M. Armstrong, Associate Gen. Counsel, F. C. C., Washington, D. C., was on the brief, for appellee.

Charles Lister, Washington, D. C., with whom Alfred C. Partoll, William D. Goddard, and .John W. Berresford, New York City, were on the brief, for intervenors American Tel. & Tel. and Illinois Bell Tel. Co.

Werner K. Hartenberger, Counsel, F. C. C., Washington, D. C., also entered an appearance for appellee.

Thomas R. Phillips, Chicago, Ill., also entered an appearance for intervenors, AT&T, et al.

Abe Fortas and Kenneth E. Hardman, Washington, D. C., also entered appearances for intervenor National Association of Radiotelephone Systems in No. 77–1352.

Before TAMM and MacKINNON, Circuit Judges, and HOWARD T. MARKEY,* Chief Judge, United States Court of Customs & Patent Appeals.

Opinion for the court filed by TAMM, Circuit Judge.

TAMM, Circuit Judge:

In this case Rogers Radio Communication Services, Inc. (Rogers) and Telocator Network of America (TNA) appeal from a deci-

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

sion of the Federal Communications Commission (Commission) granting the application of Illinois Bell Telephone Company (IBT) for authority to construct and operate, with assistance from American Telephone and Telegraph Company (AT&T),[1] a developmental cellular land mobile radio communications system in the Chicago metropolitan area.[2] The present controversy is an outgrowth of this court's previous decision upholding the Commission's allocation of frequency spectrum for the development of a nationwide, broad-band cellular system. *See National Association of Regulatory Utility Commissioners (NARUC) v. FCC,* 173 U.S.App.D.C. 413, 525 F.2d 630, *cert. denied,* 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976). We affirm the Commission's grant of IBT's application.

### I

In *Land Mobile Radio Service,* Docket No. 18262,[3] the Commission determined that development of a nationwide cellular mobile radio communication system [4] should be encouraged to serve future public need for mobile radio-telephone service.[5] Wireline carriers, such as AT&T, and radio common carriers, such as appellants,[6] are eligible to develop cellular systems if they can demonstrate the existence of necessary resources and technology. The Commission decided to authorize only developmental cellular systems "until [it was] reasonably sure that all factors necessary for regular implementation are accomplished." [7] The Commission further decided that only one developmental system would be authorized in any market or service area.[8] As explained by the Commission:

the precise number [of operational cellular systems the Commission] will authorize will depend on the overall progress of the developmental program. Following that program, [the Commission] will adopt standards to which all systems, existing and new, will be required to conform. It must be especially emphasized that the granting of a developmental authorization cannot form the basis of any reliance concerning whether a regular authorization will be granted. Any grant for regular authorization will require the licensee to comply with such standards as [the Commission] may adopt. When rules permitting regular operation are adopted, applications for conforming operational

---

1. American Telephone and Telegraph Company (AT&T) is the parent company of Illinois Bell Telephone Company (IBT). AT&T and IBT are intervenors in this appeal. General references in this opinion to AT&T include IBT.

2. This decision is reported at 63 F.C.C.2d 655 (1977).

3. 46 F.C.C.2d 752 (1974), *modified,* 51 F.C.C.2d 945, *modified,* 55 F.C.C.2d 771 (1975), *aff'd, National Assoc. of Regulatory Util. Comm'rs. (NARUC) v. FCC,* 173 U.S.App.D.C. 413, 525 F.2d 630, *cert. denied,* 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976).

4. The cellular system is

a sophisticated, high capacity land mobile system requiring a large capital investment and a substantial spectrum allocation. The spectrum assigned to such a system would be divided into discrete channels which are assigned in groups to small geographical cells covering a defined service area. The key to the cellular system's high capacity is its ability to shrink the size of those cells while holding the total amount of spectrum used by the system constant. What results is a multiple re-use of channels throughout a given geographical area and more traffic intensity per unit of spectrum in advanced stages of development than other land mobile communication systems proposed to date.

46 F.C.C.2d at 753.

5. *See* 51 F.C.C.2d at 945.

Radio telephone service is a high quality common carrier mobile radio communication service (not to be confused with the more popularly recognized "Citizens Band" radio service) whereby two-way voice communications can be carried on, via a mobile radio transmitter/receiver, between a person located . . . in a moving car or truck, and a person located at an ordinary landline telephone station.

Joint Brief for Appellants at 3 n.3.

6. Telocator Network of America (TNA) is an association of radio common carriers.

7. 46 F.C.C.2d at 761.

8. 51 F.C.C.2d at 954; 46 F.C.C.2d at 761.

cellular systems will be considered on a case-by-basis.[9]

In *NARUC v. FCC,* 173 U.S.App.D.C. 413, 525 F.2d 630, this court upheld the Commission's allocation of 40 MHz on the 900 MHz band to the development of a cellular system, over the objections of various groups, including appellant TNA (formerly National Association of Radiotelephone Systems). Although the court recognized that appellants in that case raised "substantial arguments . . . pertaining to possible anticompetitive effects of the 40 MHz allocation" in the form of AT&T monopolization of cellular systems, *id.* 173 U.S.App. D.C. at 419, 525 F.2d at 636, the court concluded that there would be ample opportunity to challenge such effects as the time approached when they would be felt and any impact on competition was more assessable. *Id.* 173 U.S.App.D.C. at 421–22, 525 F.2d at 638–39. In refusing to overturn the Commission's action, the court specifically noted that "[t]hus far, the Commission has stated its clear intention to authorize only a developmental system in the Chicago area, which will utilize only 12.5 MHz of the 40 MHz allocation." *Id.,* 173 U.S.App.D.C. at 421, 525 F.2d at 638.

IBT applied for authority to construct and operate a developmental cellular system in the Chicago metropolitan area, and AT&T intervened in its behalf.[10] The Commission returned the application to IBT, without prejudice to amendment, after finding it was deficient.[11] IBT and AT&T thereafter filed a petition for reconsideration, which the Commission granted.[12] Subject to conditions, the Commission granted IBT's application on March 10, 1977.[13] Rogers, who operates in the Chicago metropolitan area, and TNA attack the Commission's decision to grant the application.

## II

Appellants raise a number of objections to the Commission's grant of IBT's application. Initially, they allege that the Commission's decision must be reversed because the Commission failed to find—in form or in substance—that granting the application would serve the public interest, convenience and necessity. Under 47 U.S.C. § 309(a) (1970), "the Commission shall determine . . . whether the public interest, convenience, and necessity will be served by the granting of such application, and, if the Commission . . . shall find that the public interest, convenience, and necessity would be served by the granting thereof, it shall grant such application."

To the extent that appellants challenge the Commission's failure to articulate its finding of public interest, convenience, and necessity, *see generally Joseph v. FCC,* 131 U.S.App.D.C. 207, 211–12, 404 F.2d 207, 211–12 (1968) (per curiam), their argument is foreclosed by their failure to bring this alleged error to the Commission's attention in a petition for rehearing. Under 47 U.S.C. § 405 (1970):

> [t]he filing of a petition for rehearing shall not be a condition precedent to judicial review of any such order, decision, report, or action, except where the party seeking such review . . . relies on questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass.

One of the purposes of 47 U.S.C. § 405 is to afford the Commission the initial opportunity to correct errors in its decision or the proceeding leading to decision. *See Action for Children's Television v. FCC,* 183 U.S. App.D.C. 437, 447–48, 564 F.2d 458, 468–69 (1977); *W. H. Hansen v. FCC,* 134 U.S.App. D.C. 100, 102, 413 F.2d 374, 376 (1969). The Commission might have easily remedied the error alleged by appellants, had the error been brought to its attention following decision. *Cf. AT&T v. FCC,* 449 F.2d 439, 450–51 (2d Cir. 1971) (FCC's continued refusal to

---

**9.** 51 F.C.C.2d at 954.

**10.** *See* Joint Appendix (J.A.) at 6a–7a.

**11.** *Id.* at 24a–27a.

**12.** *Id.* at 142a–154a, 16a.

**13.** *Id.* at 10a–11a, 16a.

make ultimate statutory finding in face of objections demonstrates inability to make such finding). Absent a showing of particular cause and sufficient justification, we see no reason to review this alleged error when the Commission was given no opportunity for its correction. *Action for Children's Television v. FCC,* 183 U.S.App.D.C. at 448, 564 F.2d at 469.

To the extent that appellants allege that the Commission "*could not possibly make the necessary public interest findings*" to grant IBT's application, Joint Brief for Appellants at 32 (emphasis supplied)—an argument that appellants *did* advance before the Commission—the deficiencies identified by appellants either have been remedied by the Commission[14] or are raised and addressed elsewhere in this appeal.[15]

### III

■ Appellants allege that it is an "inversion of rational administrative inquiry" for the Commission to authorize the experiment with AT&T's cellular system before it decides whether the system is "inherently capable" of fulfilling the public interest, convenience and necessity. We disagree. The Commission has emphatically stated that there is no guarantee that any developmental system will be authorized to operate on a regular commercial basis. The purpose of developmental operation is to obtain information concerning the capabilities and problems of cellular technology. Equipped with such information, the Commission can set standards for cellular systems to insure that their operation will serve the public interest, convenience and necessity. *See In re Application of Illinois Bell Telephone Co.,* 63 F.C.C.2d 655, 662–63 (1977); Joint Appendix (J.A.) at 21a; text *supra* at 1228.

The Commission has the authority and the obligation to provide for experimental uses of frequencies, *see* 47 U.S.C. § 303(g) (1970), and to keep abreast of technical developments in the communications field to the end that the public interest will be served, *see* 47 U.S.C. § 218 (1970). *See also NARUC v. FCC,* 174 U.S.App.D.C. 374, 392, 533 F.2d 601, 619 (1976); *NARUC v. FCC,* 173 U.S.App.D.C. at 422, 525 F.2d at 639. Requiring the Commission to determine that an experimental system is "inherently capable" of serving the public interest would be inconsistent with the concept of experimentation itself. *See generally United Telegraph Workers v. FCC,* 141 U.S.App. D.C. 190, 195–196, 436 F.2d 920, 925–26 (1970). We conclude that it was eminently rational for the Commission to proceed in the manner in which it did.

### IV

■ Appellants assert that the Commission's decision is arbitrary and capricious because it failed to eliminate alleged anticompetitive features of AT&T's developmental cellular system. The features criticized are the switching machinery to be used in the cellular system, which is the type used in AT&T's conventional landline telephone service, and the number of mobile units that may be used for market tests. Effect on competition was clearly a proper factor for the Commission to consider under the public interest, convenience and necessity standard of 47 U.S.C. § 309(a) (1970), as the court recognized in *NARUC v. FCC,* 173 U.S.App.D.C. at 419, 525 F.2d at 636 & n.25. *See generally United States v. RCA,* 358 U.S. 334, 351–52, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959); *FCC v. RCA Communications, Inc.,*

---

14. Appellant TNA argued to the Federal Communications Commission (Commission) that it could not possibly make a finding of public interest, convenience and necessity. Objections to Grant of Application, J.A. at 59a–100a. *See* Joint Reply Brief for Appellants at 5. TNA's first objection, that IBT's application proposed a wasteful use of spectrum, J.A. at 78a–81a, was recognized and remedied by the Commission in its decision on reconsideration. *See* 63 F.C.C.2d at 657, 659.

15. TNA's other objections before the Commission dealt with system design features and anticompetitive problems. These issues are raised on this appeal in TNA's argument that the grant of IBT's application was arbitrary, capricious, and an abuse of discretion. *See* J.A. at 82a–98a; Joint Brief for Appellants at 40–41.

346 U.S. 86, 91–97, 73 S.Ct. 998, 97 L.Ed. 1470 (1953).[16]

■ With respect to the switching machinery, the Commission took steps to insure that during the operation of the developmental system, the switching machinery will not simultaneously serve conventional and mobile telephones and that the separate cost of the switching machinery will be identified and reported. 63 F.C.C.2d at 663. This cost information should enable the Commission to prevent cross-subsidization.[17] The Commission's response to possible anti-competitive consequences was adequate for purposes of the developmental system. Any anticompetitive behavior resulting from the use of this switching machinery, including cross-subsidization, can be assessed after the results of the developmental system are in. *See generally NARUC v. FCC*, 173 U.S.App.D.C. at 421–422, 525 F.2d at 638–39.

■ The Commission authorized AT&T to operate a maximum of 2,500 mobile units for market service tests. The number of mobile units was reduced from 5,000 to 2,500 because the Commission considered the latter number "adequate . . . for purposes of market evaluation, without effectively foreclosing the market to existing RCC's [radio common carriers] in the Chicago area." 63 F.C.C.2d at 660. Although the Commission allowed no more than 135 units to be operated during the equipment testing phase of the developmental system, operation of up to 2,500 units was thought necessary in order to evaluate public demand for cellular service. *See id.* This was a reasoned judgment within the expertise of the Commission. We cannot conclude that the decision was arbitrary or capricious.

V

■ The Commission originally rejected IBT's application because, *inter alia*, the frequency reuse capability of the proposed developmental system represented a departure from the "small cell" concept accepted by the Commission.[18] *See In re Application of Illinois Bell Telephone Co.*, 62 F.C.C.2d

**16.** The recent decision of this court in *United States v. FCC*, No. 77–1249, slip op. àt 26-29 (D.C.Cir. Aug. 29, 1978) (per curiam), discussed the Commission's role upon finding the existence of an antitrust violation within the scope of section 11 of the Clayton Act, 15 U.S.C. § 21 (1976). This case does not present an antitrust contention within the purview of section 11. Appellants' arguments relate only to section 2 of the Sherman Act, 15 U.S.C. § 2 (1976).

**17.** In *NARUC v. FCC*, 173 U.S.App.D.C. at 420–421, 525 F.2d at 637–38 & n.34, this court discussed the antitrust dangers of cross-subsidization.

**18.** The "small cell" concept is explained by appellants:

A "cellular" radio telephone system is a complex and untested technology for providing radio telephone service to the public through common carrier facilities. In a "cellular" system, a geographically dispersed and systematically ordered array of low powered base stations or "cells" collectively provide radio signal coverage for mobile units throughout a metropolitan or other prescribed service area. By contrast, more conventional systems provide the same geographic signal coverage from one or two base station transmitter locations, by using higher power transmitters.

The putative advantage of cellular systems is that the multiple low powered base stations or "cells" enable the same frequency channel to be used simultaneously at more than one location in a metropolitan area. This feature significantly enhances both the system's spectral efficiency and its customer capacity per unit of spectrum, as compared to more conventional radio telephone systems. Apart from the untested nature of the technology involved, its chief disadvantage is that the relatively small "cells" required to achieve frequency reuse in a market also make it necessary to have elaborate and extremely sophisticated facilities to automatically "hand off" a mobile unit from one "cell" to another. This is so because the conversation length of a single cell, normally about three to five minutes, is such that a moving car or truck is likely to pass out of the coverage area of the "cell" with which the communication circuit is initially established. Accordingly, the need for the sophisticated "hand off" capability, and for a large number of "cell" sites and transmitters, combine to make the investment in fixed network plant associated with "cellular" systems vastly more costly than comparably sized, but more conventionally-configured, radio telephone systems.
Joint Brief for Appellants at 4–5 (footnote omitted).

436, 437 (1976). The Commission changed its position after reconsideration, and appellants attack this action as arbitrary and capricious.

On reconsideration of the application, the Commission decided that it could rely on the technical findings of studies being conducted by AT&T in Newark, New Jersey, to demonstrate the technical feasibility of a small cell system. The Commission decided that the Chicago developmental system should be operated under "stringent limitations" to test technical and market characteristics of a cellular approach, and to serve, in conjunction with the Newark system, as a basis for further rulemaking. 63 F.C.C.2d at 659. Although the Commission recognized AT&T's arguments concerning the need to proceed as economically as possible and to expand as needed, *id.* at 659, it ruled that "[p]rior to conversion to regular operation, the Chicago operation together with the Newark test bed findings must satisfactorily demonstrate the frequency reuse capability originally contemplated by the Commission." *Id.* at 660. We agree with the Commission that it "can change its mind when it explains why," Brief for Appellee at 31 (citing *Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 383, 394, 444 F.2d 841, 852 (1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971)), and we conclude that its decision to defer small cell operation in the Chicago developmental system was not arbitrary or capricious.

### VI

Appellants contend that the Commission violated 47 U.S.C. § 309(e) (1970) [19] by failing to conduct an evidentiary hearing prior to granting IBT's application. They assert that the Commission was obligated to conduct a hearing to determine whether alleged anticompetitive features of the proposed cellular system rendered it contrary to the public interest, convenience and necessity. *See* Joint Brief for Appellants at 33–39. We conclude that, at the stage of the Commission's proceedings under review, appellants' allegations of anticompetitive consequences did not present a "substantial" question of fact necessitating "a full hearing" under 47 U.S.C. § 309(e).

■ Although we agree that resolution of questions concerning anticompetitive implications of proposed agency action may often "benefit[ ] from ventilation at a formal hearing," an evidentiary hearing is not always necessary. *Marine Space Enclosures, Inc. v. FMC,* 137 U.S.App.D.C. 9, 21–22, 420 F.2d 577, 589–90 (1969); *see United States v. CAB,* 167 U.S.App.D.C. 313, 315, 323, 511 F.2d 1315, 1317, 1325 (1975); [20] *National Air Carrier Association v. CAB,* 141 U.S.App.D.C. 31, 40, 436 F.2d 185, 194 (1970). "The decision whether to hold hearings 'is a matter in which the Commission's discretion . . . is paramount.'" *National Association for Better Broadcasting v. FCC,* 192 U.S.App.D.C. 203 at 207, 591 F.2d 812 at 816 (1978) (quoting *Columbus Broadcasting Coalition v. FCC,* 164 U.S. App.D.C. 213, 217, 505 F.2d 320, 324 (1974)).

■ An allegation of antitrust problems will not always present a "substantial and

The Commission originally rejected the application because there would be frequency reuse in the Chicago system at a distance of forty-eight miles, which is comparable to that employed in non-cellular systems. 62 F.C.C.2d 436, 437 (1976).

19. 47 U.S.C. § 309(e) (1970) provides in part:
    If, in the case of any application . . . a substantial and material question of fact is presented or the Commission for any reason is unable to make the finding specified in [the subsection relating to public interest, convenience and necessity], it shall formally designate the application for hearing on the ground or reasons then obtaining and shall forthwith notify the applicant and all other known parties in interest of such action and the grounds and reasons therefor, specifying with particularity the matters and things in issue but not including issues or requirements phrased generally.

20. In *United States v. CAB,* 167 U.S.App.D.C. 313, 315, 511 F.2d 1315, 1317 (1975), the court noted that "an experiment in certain markets" might be a way to test competitive consequences before agency resolution of issues related to competition.

material question of fact" under 47 U.S.C. § 309(e).[21] Whether a substantial question of fact under the statute is presented will depend, *inter alia*, on the immediacy of the alleged anticompetitive consequences and any justification for deferral of their consideration. *See generally Gulf States Utilities Co. v. FPC*, 411 U.S. 747, 762–63, 93 S Ct. 1870, 36 L.Ed.2d 635 (1973); *Denver & Rio Grande Western Railroad Co. v. United States*, 387 U.S. 485, 498, 87 S.Ct. 1754, 18 L.Ed.2d 905 (1967).

In this case, serious anticompetitive effects will occur, if at all, only upon commercial implementation of AT&T's cellular system. *See NARUC v. FCC*, 173 U.S.App. D.C. at 421, 525 F.2d at 638. Before commercial operation may begin, IBT must seek authority from the Commission. *See* 63 F.C.C.2d at 660. At that time, the Commission will have developmental reports from the Chicago equipment and market tests and from the Newark technical tests, as well as comprehensive financial reports, *id.*, which can be considered in its decision.[22] Because there will be "ample opportunity to challenge anticompetitive effects as the time approaches when they will be felt, and the extent of the impact on competition becomes more readily assessable," *NARUC v. FCC*, 173 U.S.App.D.C. at 422, 525 F.2d at 639, we conclude that appellants' allegations of anticompetitive effects did not present a "substantial and material question of fact" necessitating a "full hearing" under 47 U.S.C. § 309(e) at the stage of Commission proceedings under review.

## VII

■ After the Commission initially denied IBT's application, *see* 62 F.C.C.2d at

437, and IBT and AT&T filed a petition for reconsideration, *see* J.A. at 142a–154a, an AT&T vice-president sent a letter to the Commission, with copies to all parties of record, elaborating the reasons why the Commission should reconsider its denial of the application, *id.* at 168a–171a. In response, appellants moved the Commission to strike the letter as unauthorized and to deny summarily the petition for reconsideration. *Id.* at 172a–179a. The Commission struck the letter but concluded that other relief was not warranted. *See* 63 F.C.C.2d at 664.

Appellants assert that the letter contained a "misleading representation" concerning the additional cost of the developmental approach suggested by the Commission in its denial order. They contend that whether the representation influenced the Commission is unknown. Joint Brief for Appellants at 43. Appellants liken this case to *WKAT, Inc. v. FCC*, 111 U.S.App.D.C. 253, 296 F.2d 375 (per curiam), *cert. denied*, 368 U.S. 841, 82 S.Ct. 63, 7 L.Ed.2d 40 (1961), and *Sangamon Valley Television Corp. v. United States*, 106 U.S.App.D.C. 30, 269 F.2d 221 (1959). Those cases involved secret ex parte contacts by persons outside the Commission during agency proceedings. *See also, United States Lines, Inc. v. FMC*, 189 U.S.App.D.C. 361 at 375, 584 F.2d 519 at 533 (1978); *Home Box Office, Inc. v. FCC*, 185 U.S.App.D.C. 142, 184–192, 567 F.2d 9, 51–59 (per curiam), *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977).

This case is immediately distinguishable from those relied upon by appellants. The letter from the AT&T vice-president was not secret or surreptitious. Copies of the

---

**21.** Although *United States v. FCC*, No. 77–1249, slip op. at 35 n.100 (D.C. Cir. Aug. 29, 1978) speaks in terms of the "explicit standards" found in section 309(e) of the Communications Act of 1934, we do not think that the remark was intended to suggest that every allegation of anticompetitive problems would necessitate an evidentiary hearing under section 309(e).

**22.** IBT's application to develop a cellular system in Chicago contained a schedule that contemplated completion of construction, equip-

ment tests, and service tests by January 1, 1979, the date established by the Commission for completion of developmental operation. *See* 51 F.C.C.2d 945, 955. IBT and AT&T petitioned the Commission on September 18, 1978, to extend the deadline to January 1, 1980, for the purpose of conducting the service test. *See* letter from Kenneth E. Hardman, Fortas & Koven, to George A. Fisher, Clerk, U.S. Court of Appeals for the District of Columbia Circuit (Oct. 10, 1978) (attaching Petition filed with Commission by IBT and AT&T).

letter were sent to all parties to the agency proceeding, including appellants. Appellants had the opportunity to take action in response to the letter, and responded by filing a motion to strike it from the record. The Commission agreed with appellants that the letter was an unauthorized pleading and struck it from the record. We have no reason to think that the Commission relied on the letter in reaching its ultimate decision. *See generally Action for Children's Television, Inc. v. FCC,* 183 U.S.App. D.C. 437, 455, 564 F.2d 458, 476.

Appellants argue that the only meaningful remedy for AT&T's unauthorized pleading would have been a rejection of the petition for reconsideration. We do not believe that such a remedy was necessary, and we conclude that the Commission was well within its discretion when it struck the letter from the record.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the Commission.

*Affirmed.*