**NATIONAL ASSOCIATION FOR BETTER BROADCASTING, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**KCOP Television, Inc., Intervenor.**

**No. 85–1318.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 27, 1986.

Decided Sept. 29, 1987.

Daniel Warshawsky, with whom Wilhelmina Reuben Cooke, Washington, D.C., Jerome E. Weinstein, Beverly Hills, Cal., and Craig Iscoe, Washington, D.C., were on the brief, for appellant.

C. Grey Pash, Jr., Counsel, F.C.C., with whom Jack D. Smith, General Counsel, and Daniel M. Armstrong, Associate General Counsel, F.C.C., were on the brief, for appellee.

Howard F. Roycroft, Richard S. Rodin and Robert L. Corn, Washington, D.C., were on the brief, for intervenor, KCOP Television, Inc.

Before ROBINSON and GINSBURG, Circuit Judges, and EDWARD D. RE,* Chief Judge, United States Court of International Trade.

Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

National Association for Better Broadcasting (NABB) petitions for review of an order of the Federal Communications Commission dismissing its complaint charging television station KCOP–TV with violations of the sponsorship identification provision of the Communications Act of 1934.[1] We conclude that the Commission's ruling rested upon an impermissible interpretation of the Act, and find its post hoc attempts to explain its rationale unpersuasive. We accordingly reverse, and remand the case to the Commission for further proceedings.

## I. BACKGROUND

### A. *The Complaint*

NABB's complaint centered upon the airing by Los Angeles television station KCOP–TV of the syndicated children's program "He-Man and the Masters of the Universe" (He-Man). He-Man is based upon a line of fantasy-action figures created and manufactured by Mattel, Inc. The program is produced by Mattel and Group W Productions, which spent an estimated cost of $14 million for the first 65 episodes.[2] Mattel and Group W offer the program to independent television stations on a "straight barter" basis, whereby each episode is furnished in exchange for two minutes of commercial time distributed throughout the children's broadcast day.[3]

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

1. Pub.L. No. 416, tit. 3, § 317, 48 Stat. 1064, 1089 (codified as amended at 47 U.S.C. § 317 (1982)) [hereinafter cited as codified].

2. Complaint, *National Ass'n for Better Broadcasting v. KCOP Television* (filed Mar. 21, 1984), Exhibit (Ex.) 5, Joint Appendix (J.App.) 41.

3. *Id.*, Ex. 4, J.App. 39. Such arrangements are common in children's television; approximately 70% of children's syndicated programming was distributed pursuant to barter agreements in 1983. Opposition, *National Ass'n for Better*

NABB is a California-based nonprofit corporation dedicated to the promotion of quality radio and television broadcasting.[4] NABB filed with the Commission a complaint against KCOP–TV, an independent VHF television station serving the Los Angeles signal area.[5] The complaint challenged the propriety of KCOP–TV's acquisition of the He-Man series through a barter arrangement with Mattel and Group W, alleging that the exchange transgresses Section 317(a) of the Communications Act.[6] NABB asserted that the concession of two minutes of commercial time[7] for the privilege of airing each He-Man episode constitutes a "token payment," given the significant expense incurred by Mattel and Group W to produce the program.[8] NABB alleged that He-Man's producers conferred a great benefit on KCOP–TV by providing this popular program at such a nominal cost, and thus that Section 317 requires an announcement adequately identifying Mattel and Group W as the true sponsors of the program.[9]

In opposition, KCOP–TV disputed NABB's characterization of the commercial time exchanged as token payment.[10] The station noted that barter is an increasingly popular means of financing and distributing children's programming,[11] and asserted that the two minutes of air time traded for each He-Man installment had significant worth—so much, KCOP–TV declared, that the aggregate annual value of the commercial time it had exchanged had increased from $300 thousand at the time of the barter agreement to approximately $400 thousand at the time the opposition was filed.[12] In the alternative, KCOP–TV contended that an announcement of sponsorship would not be required even if the commercial time traded is properly to be deemed "token" consideration, since Section 317(a)(1) exempts programs furnished without cost by an organization or individual not mentioned, or mentioned only incidentally, in the broadcast.[13] The station insisted that since He-Man is furnished by Mattel and Group W, and since the program mentions neither beyond the credit to Mattel, it falls within the category exempted by Section 317.[14] In response, NABB disputed KCOP–TV's estimate of the value of commercial time exchanged and the sta-

---

*Broadcasting v. KCOP Television* (filed May 17, 1984), Attachment C, J.App. 63.

4. Complaint, *supra* note 2, at 2, J.App. 10.

5. *Id.* at 3, J.App. 11. The majority of NABB members reside in the Los Angeles signal area. *Id.*, J.App. 11.

6. *Id.* at 4, J.App. 12. Section 317 provides in relevant part:
   All matter broadcast by any radio station for which any money, service or valuable consideration is directly or indirectly paid, or promised to or charged or accepted by, the station so broadcasting, from any person, shall, at the time the same is so broadcast, be announced as paid for or furnished, as the case may be, by such person: *Provided,* That "service or other valuable consideration" shall not include any service or property furnished without charge or at nominal charge for use on, or in connection with, a broadcast unless it is so furnished for consideration for an identification of any person, product, service, trademark, or brand name beyond an identification which is reasonably related to the use of such service or property on the broadcast.
   47 U.S.C. § 317(a)(1) (1982). Radio station is defined by the Act to encompass television stations. See *id.* §§ 153(b), (k).

7. KCOP–TV's barter agreement specifies that no commercial for He-Man products may be aired during or adjacent to the program. Opposition, *supra* note 3, at 2, J.App. 46.

8. Complaint, *supra* note 2, at 9, J.App. 17.

9. *Id.* at 13, J.App. 21. The only announcement of this sort associated with the He-Man program is made at the end of each episode, when information that the trademarked characters are featured with Mattel's permission is displayed along with other credits at what NABB describes as "near subliminal speed." *Id.*, J.App. 14–15.

10. Opposition, *supra* note 3, at 4–5, J.App. 48–49.

11. *Id.* at 4, J.App. 48. KCOP–TV furnished several magazine accounts describing the prevalence of barter arrangements in the area of children's programming. *Id.*, Attachments B & C, J.App. 57, 63.

12. Opposition, *supra* note 3, at 5, J.App. 49.

13. *Id.* at 6, J.App. 50.

14. *Id.* at 6–7, J.App. 50–51.

tion's claim of exemption from Section 317.[15]

### B. *The Commission Decision*

The Commission consolidated its review of NABB's complaint with several others filed by Action for Children's Television (ACT) against various broadcast licensees. ACT complained that the licensees were in violation of the Commission's regulations and policies against program-length commercials by televising He-Man and seven other programs with substantial product tie-ins.[16] After outlining the substance of the complaints before it[17] and the licensees' objections thereto,[18] the Commission addressed NABB's Section 317 argument and ACT's program-length commercial thesis in a single inquiry. The Commission stated that since the broadcast material challenged by NABB and ACT consisted entirely of children's programs, the 1974 Children's Television Report & Policy Statement[19] guided consideration of both claims.[20] The Commission further stated that a breach of the 1974 Policy Statement would be found only "when the program

segment is 'so interwoven with, and in essence auxiliary to the sponsor's advertising ... to the point that the entire program constitutes a single commercial promotion for the sponsor's products or services....' "[21]

Applying that standard to the complaints before it, the Commission stated that each broadcaster had made a good faith determination that He-Man and the other challenged programs possessed significant entertainment value for child audiences,[22] and that it could see "no useful purpose in restricting unnecessarily presentations of programs merely because products are depicted therein."[23] Accordingly, the Commission dismissed the complaints because

> ACT and NABB have not demonstrated that the programs identified by their complaints ... violate the sponsorship identification provisions of the rules or statute, violate the policies contained in the 1974 Policy Statement, or that their broadcast is otherwise inconsistent with the Commission's concern for the child audience so as to require further action.[24]

**15.** Response of National Association for Better Broadcasting, *National Ass'n of Better Broadcasting v. KCOP Television* (filed June 26, 1984) at 8b, J.App. 103.

**16.** *Action for Children's Television*, 58 Rad.Reg. 2d (P & F) 61, ¶ 2, at 62 (May 11, 1985) [hereinafter *Commission Decision*]. ACT also filed a separate complaint against a New Orleans licensee for violation of the Commission's "host-selling" prohibition in connection with a locally-produced children's program. *Id.* ¶ 7, at 64.

**17.** *Id.* ¶¶ 2, 3, 6, 7, 9, at 63–64.

**18.** *Id.* ¶¶ 4, 5, 8, 10, at 63–64.

**19.** 50 F.C.C.2d 1 (1974) [hereinafter 1974 Policy Statement]. In 1984, the Commission eliminated its commercialization policies for general television programming on the ground that "commercial levels will be effectively regulated by market-place forces...." *Revision of Programming and Commercialization Policies, Ascertainment Requirements, and Program Log Requirements for Commercial Television Stations,* 98 F.C.C.2d 1076 (1984). In 1986, the Commission clarified its deregulation report by specifying that the commercialization guidelines for children's programming had also been eliminated. *Memorandum Opinion and Order on Reconsideration of the Report,* 104 F.C.C.2d 358, 372 (1986). This clear repudiation of the 1974

Policy Statement was recently rejected by a panel of this court, which concluded that the Commission had not provided adequate explanation for its abrupt change in policy. *Action for Children's Television v. FCC,* 821 F.2d 741 (D.C.Cir. 1987). Since we find that the 1974 Policy Statement did not in any event furnish an acceptable basis for dismissal of NABB's complaint, see note 55 *infra,* that disapprobation of the Statement has had no role in our disposition.

**20.** *Commission Decision, supra* note 16, 58 Rad. Reg.2d (P & F) ¶ 15, at 66.

**21.** *Id.* ¶ 16, at 66 (quoting *Applicability of Policies on Program-Length Commercials,* 44 F.C.C. 2d 985, 989 (1974)).

**22.** *Commission Decision, supra* note 16, 58 Rad. Reg.2d (P & F) ¶ 18, at 67.

**23.** *Id.*

**24.** *Id.* ¶ 18, at 67–68. The Commission did find merit in ACT's claim that the New Orleans station had disobeyed the agency's "host-selling" restrictions, see note 16 *supra,* but ruled that no action was required since the station had sufficiently remedied the violation. *Commission Decision, supra* note 16, 58 Rad.Reg.2d (P & F) ¶ 19, at 68.

NABB then petitioned for review by this court, and KCOP–TV has intervened in defense of the Commission's order.[25]

## II. ANALYSIS

### A. *Reviewability*

We first address the argument, pressed by the Commission and elaborated upon by KCOP–TV, that the Commission's dismissal order is unreviewable because NABB did not seek administrative reconsideration of it.[26] Section 405 of the Communications Act, which governs judicial review of Commission orders, provides in relevant part:

> The filing of a petition for reconsideration shall not be a condition precedent to judicial review of any such order, decision, report, or action, except where the party seeking such review ... (2) relies upon a question of fact or law upon which the Commission or designated authority within the Commission, has been afforded no opportunity to pass.[27]

The Commission and KCOP–TV say that the Commission has had no opportunity to pass on NABB's contention that it "misconstrued" or "misinterpreted" the Section 317 claim, and consequently that Section 405(2) bars NABB's quest for judicial review. We find this contention meritless.

Ordinarily, disgruntled parties are not required to seek administrative reconsideration before challenging a Commission order in this court, and exceptions to this general rule are to be construed narrowly.[28] By our interpretation, Section 405(2) forecloses judicial review of Commission decisions in only two situations: where the Commission has had no opportunity to pass on the factual or legal issues raised before the court,[29] and where the challenge is predicated upon a technical defect in a Commission decision which could easily have been cured if called to the Commission's attention on reconsideration.[30] An examination of NABB's petition for review shows clearly that it does not fall within either of these categories.

Indubitably, the Commission not only understood that the gravamen of NABB's grievance was that KCOP–TV was infringing Section 317,[31] but the Commission actually purported to dispose of that charge in its order.[32] Just as clearly, the Commission had full opportunity to resolve the Section 317 issues presented. Moreover, the attack that NABB mounted was not in the nature of a technical objection that expectably would be remedied easily by the Commission upon reconsideration. NABB does not argue that the Commission

**25.** Since ACT has not joined in this appeal, we do not, of course, consider the Commission's disposition of the program-length commercial claim.

**26.** Brief for Respondent at 19; Brief for Intervenor at 7–12.

**27.** 47 U.S.C. § 405 (1982).

**28.** *Way of Life Television Network, Inc. v. FCC,* 193 U.S.App.D.C. 202, 205, 593 F.2d 1356, 1359 (1979); *Office of Communication of United Church of Christ v. FCC,* 150 U.S.App.D.C. 339, 343, 465 F.2d 519, 523 (1972); see also *Washington Ass'n for Television & Children v. FCC,* 229 U.S.App.D.C. 363, 367–368 n. 5, 712 F.2d 677, 681–682 n. 5 (1983) (legislative history of § 405 reveals that "[t]he main thrust of the provision may have been to ensure that in the mine run of cases, where issues had been raised before the agency, the party could obtain judicial review without first petitioning the Commission for a rehearing").

**29.** E.g., *Washington Ass'n for Television & Children v. FCC, supra* note 28, 229 U.S.App.D.C. at 367, 712 F.2d at 681; *Alianza Federal de Mercedes v. FCC,* 176 U.S.App.D.C. 253, 258, 539 F.2d 732, 739 (1976).

**30.** E.g. *United States v. FCC,* 227 U.S.App.D.C. 413, 422, 707 F.2d 610, 619 (1983) (charge that Commission failed to provide adequate written explanation for its order cannot be raised for the first time before this court); *Rogers Radio Communications Serv. v. FCC,* 193 U.S.App.D.C. 71, 75, 593 F.2d 1225, 1229 (1978) (Commission must be given opportunity to correct failure to use required statutory terminology before that objection can be raised on review); see also *FTC Communications, Inc. v. FCC,* 750 F.2d 226, 231 (2d Cir.1984) (challenge based upon a "formalistic error" in Commission decision not subject to review where reconsideration was not requested, since "Section 405 contemplates that the Commission be given the chance to rectify such an error").

**31.** *Commission Decision, supra* note 16, 58 Rad. Reg.2d (P & F) ¶ 9, at 64.

**32.** *Id.* ¶ 18, at 67–68.

employed improper terminology, but that it relied upon faulty reasoning. Judicial review under Section 405 is appropriate notwithstanding NABB's failure to seek Commission reconsideration.

## B. The "Commercial Matter" Limitation

■ The basis for dismissal of NABB's complaint was the Commission's interpretation of Section 317 of the Communications Act, particularly the agency's conclusion that Section 317 does not apply to programs targeting child audiences unless the broadcast is so interwoven with commercial matter that the entire program is commercial in character.[33] Accordingly, our first and foremost task on review is to evaluate that interpretive conclusion. Our inquiry is guided by the Supreme Court's *Chevron*[34] blueprint for review of agency statutory interpretations:

First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction of the

statute, as would be necessary in the absence of administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.[35]

In the present case, our inquiry is quite abbreviated, for we find that the Commission's proffered interpretation of Section 317 plainly conflicts with the unambiguously expressed intent of Congress.

The statutory language extending the requirement of sponsorship identification to "[a]ll matter broadcast" is as clearly a barrier to the Commission's attempted limitation on its scope as words are capable of erecting, and nothing in the legislative history indicates that they do not mean precisely what they say. This provision originated in the Radio Act of 1927,[36] and at no point during congressional discussion of this legislation was the position advanced that an announcement on sponsorship was necessary only in purely commercial broadcasts. The provision was codified, without amendment or debate, in the Communications Act of 1934,[37] and in 1959 the Commission itself held that the words "[a]ll matter broadcast" prohibited any restriction upon the applicability of Section 317 as well as exclusion of any class of broadcast matter from its demand.[38] Congress re-

33. See note 21 *supra* and accompanying text. The Commission has power to waive the sponsorship identification requirement in any case or class of cases upon a determination that the public interest, convenience or necessity does *not require such an* announcement, 47 U.S.C. § 317(d) (1982), but neither the Commission nor KCOP–TV invoked that authority in the proceeding under review. This case therefore involves an incident of statutory construction, and not an exercise of discretion under the waiver clause.

34. *Chevron, USA, Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

35. *Id.* at 842–843, 104 S.Ct. at 2782, 81 L.Ed.2d at 702–703 (footnotes omitted); see also *International Bhd. of Teamsters v. Daniel,* 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808, 820 n. 20 (1979) (deference owed to agency statutory interpretation "is constrained by our obligation to honor the clear meaning of a statute, as revealed by its language, purpose and

history") (citations omitted); *NLRB v. Brown,* 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed. 839, 849 (1965) ("[r]eviewing courts are not obliged to stand aside and rubber stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute"); cf. *INS v. Cardoza-Fonseca,* — U.S. —, —, 107 S.Ct. 1207, 1220–1223, 94 L.Ed.2d 434, 457–459 (1987) (resolution of pure questions of statutory construction "is well within the province of the judiciary").

36. Pub.L. No. 69–632, § 19, 44 Stat. 1162, 1170 (1927).

37. Pub.L. No. 73–416, § 317, 48 Stat. 1064, 1089 (codified as amended at 47 U.S.C. § 317 (1982)).

38. *In re "Teaser" Announcements,* 40 F.C.C. 60 (1959) (denying broadcasters' requests that "teaser" announcements—short promotional messages designed to pique the curiosity of

vised the Act substanitally soon after this ruling, but left the clause "[a]ll matter broadcast" unchanged.[39] And while Congress at that time did amend the Act to empower the Commission to waive the requirement of sponsorship announcement in certain circumstances, the existence of that authority is irrelevant to the litigation before us today.[40]

There is yet another piece of legislative history that demonstrates convincingly that Section 317 cannot properly be confined to broadcasts of purely commercial matter. In 1960, Congress amended Section 317, adding, *inter alia*, the proviso in what is now Section 317(a)(1).[41] The report of the House Committee on Interstate and Foreign Commerce,[42] which championed the amendments, elucidated the meaning of the expression "service or other valuable consideration" therein.[43] The Committee explained that "the proviso would establish a general rule that an announcement shall not be required under section 317 with respect to any service or property furnished 'without charge or at a nominal charge' to a broadcast licensee for use on or in connection with a broadcast,"[44] but emphasized that "this is subject to the exception that an announcement will be required if

the service or property is furnished 'in consideration for an identification in a broadcast of any person, product, service, trademark, or brand name *beyond an identification which is reasonably related to the use of such service or property on the broadcast.'* "[45]

The Committee illustrated the intended reach of § 317(a)(1) by describing that subsection's applicability or nonapplicability in numerous hypothetical situations.[46] One example given by the Committee involves a bus company furnishing a scenic travel film to broadcasters without charge.[47] If no mention is made in the film of the bus company or its buses, no announcement is required because, the Committee said, "there is no payment other than the matter furnished for the broadcast and there is no mention of the bus company."[48] Nor would an announcement become necessary even if the bus "is shown fleetingly in highway views in such a manner reasonably related to that travel program."[49] If, however, "the bus, clearly identifiable as that of the bus company which supplied the film, is shown to an extent disproportionate to the subject matter of the film[,] ... [a]n announcement is required, because in this case by the use of the film the broadcaster

viewers without advertising the product until its identification in the final announcement of the series—be exempted from the sponsorship identification provision). "The Act," said the Commission, "by its terms applies without distinction to commercial or program material. Its broad language, 'all matter,' encompasses 'teaser' announcements...." *Id.* at 61. See also note 55 *infra.*

39. Pub.L. No. 86–752, § 8, 74 Stat. 889, 895 (1960).

40. *Id.*, 74 Stat. 896 (codified at 47 U.S.C. § 317(d) (1982)). Waiver of the sponsorship identification rule is authorized "in any case or class of cases with respect to which [the Commission] determines that the public interest, convenience, or necessity does not require the broadcasting of such announcement." 47 U.S.C. § 317(d) (1982). As we have observed, however, see note 33 *supra,* the Commission did not make those determinations here; instead, it concluded that § 317 did not apply to broadcasts of He-Man because the content of the program was not wholly commercial matter. See note 21 *supra* and accompanying text.

41. Communications Act Amendments, 1960, Pub.L. No. 86–752, § 8, 74 Stat. 889, 895.

42. H.R.Rep. No. 1800, 86th Cong., 2d Sess. (1960), *reprinted in* [1960] U.S.Code Cong. & Admin.News 3516.

43. See note 6 *supra.*

44. H.R.Rep. No. 1800, *supra* note 42, at 20, *reprinted in* [1960] U.S.Code Cong. & Admin. News 3527–3528.

45. *Id.* at 20, *reprinted in* [1960] U.S.Code Cong. & Admin.News 3528 (emphasis in original).

46. *Id.* at 20–24, *reprinted in* [1960] U.S.Code Cong. & Admin.News 3528–3532.

47. *Id.* at 24 (examples 26(a)–(c)), *reprinted in* [1960] U.S.Code Cong. & Admin.News 3531–3532.

48. *Id.* (example 26(a)), *reprinted in* [1960] U.S. Code Cong. & Admin.News 3531.

49. *Id.* (example 26(b)), *reprinted in* [1960] U.S. Code Cong. & Admin.News 3532.

has impliedly agreed to broadcast an identification beyond that reasonably related to the subject matter of the film." [50]

Similarly, the Committee continued, if a manufacturer furnishes a grand piano for use on a concert program and insists that enlarged insignia of the brand name be affixed over normal insignia on the piano, an announcement must be made if the enlarged insignia is shown.[51] And, if "the piano furnished has normal insignia and during the course of the televised concert the broadcast includes occasional closeups of the pianist's hands, no announcement is required even though all or part of the insignia appears in these closeups[,]" for "[h]ere the identification of the brand name is reasonably related to the use of the piano by the pianist on the program." [52] On the other hand, "if undue attention is given the insignia rather than the pianist's hands, an announcement would be required." [53]

It is evident from these examples, and indeed a host of others,[54] that Congress meant that Section 317(a)(1) is to be given its normal operative force even though the program in question might not be regarded as entirely commercial in content. By the Commission's current interpretation, however, no sponsorship announcement is required so long as the program, though directed toward a children's audience, is entertaining and something less than wholly commercial. That interpretation, already severely battered by the statutory language and the legislative history, suffers still another blow from its departure from the agency's own past practice.[55] We are satisfied that the Commission's construction of Section 317 is inconsistent with the manifest intent of Congress.[56]

## C. Other Arguments

■ Absent some other consideration providing adequate legal support, the Com-

**50.** *Id.* (example 26(c)), *reprinted in* [1960] U.S. Code Cong. & Admin.News 3532.

**51.** *Id.* (example 27(a)), *reprinted in* [1960] U.S. Code Cong. & Admin.News 3532.

**52.** *Id.* (example 26(b)), *reprinted in* [1960] U.S. Code Cong. & Admin.News 3532.

**53.** *Id.* (example 27(b)), *reprinted in* [1960] U.S. Code Cong. & Admin.News 3532.

**54.** See *id.* at 20–24, *reprinted in* [1960] U.S.Code Cong. & Admin.News 3528–3532.

**55.** See note 38 *supra* and accompanying text; see also *INS v. Cardoza-Fonseca, supra* note 35, —— U.S. at —— n. 30, 107 S.Ct. at 1221 n. 30, 94 L.Ed.2d at 457 n. 30 (agency interpretation conflicting with past agency practice is entitled to less deference than a "consistently held agency view"); *International Bhd. of Teamsters v. Daniel, supra* note 35, 439 U.S. at 566, 99 S.Ct. at 800, 58 L.Ed.2d at 820 (overturning FCC interpretation that was "neither longstanding nor arguably within the outer limits of its authority to interpret these acts"); cf. *FCC v. WNCN Listeners Guild,* 450 U.S. 582, 598–599, 101 S.Ct. 1266, 1276–1277, 67 L.Ed.2d 521, 536–537 (1981) (consistency of agency policy in given area supports its construction of statute).

In 1963, the Commission held that the requirement of sponsorship identification was triggered when Mattel furnished, at no cost to broadcasters, a program featuring characters licensed by it. *Mattel, Inc.,* 40 F.C.C. 159, 160 (1963). Mattel contended that the high quality of the program justified a waiver but the Com-

mission disagreed, apparently concluding that the undisputed entertainment value of the show did not relieve the broadcaster of its duties under § 317(a)(1). *Id.* And, despite the Commission's current reliance upon its 1974 Policy Statement, see notes 19–20 *supra* and accompanying text, that ruling does not purport to alter the demands of § 317(a)(1) as it was then interpreted. At the request of ACT and other concerned citizens' groups, the Commission in 1974 considered whether more stringent limitations should be imposed on broadcasters of children's programming. 1974 Policy Statement, *supra* note 19, 50 F.C.C.2d ¶ 24, at 7. The Commission found that broadcasters did have special responsibilities to young audiences, and in that context it discussed needed requirements for separation of program and commercial matter. *Id.* ¶ 46, at 15. The restrictions resulting were clearly promulgated as special, additional measures, *id.* ¶¶ 48–50, at 15, intended to supplement, rather than replace, the sponsorship identification rule applicable to programming in general.

**56.** Since we view the Commission's interpretation as violative of congressional intent, we do not address the charge that it is also inconsistent with the agency's regulation implementing § 317, 47 C.F.R. § 73.1212 (1986). Although an agency's interpretation of its own regulation is often of "controlling weight," e.g., *Belco Petroleum Corp. v. FERC,* 191 U.S.App.D.C. 157, 162, 589 F.2d 680, 685 (1978), we cannot countenance any agency determination at war with an unambiguous congressional mandate. See notes 34–35 *supra* and accompanying text.

mission's determination that the He-Man show is not a wholly commercial venture does not furnish an acceptable basis for dismissal of NABB's complaint. In this court, however, the Commission offers for the first time alternate grounds for its action. This effort is doomed because these reasons were not elements of the Commission's decision.[57]

As the Supreme Court has instructed, when a policy decision yet unmade is necessary to support an agency's disposition, "a judicial judgment cannot be made to do service for an administrative judgment. For the purpose of affirming no less than reversing its orders, an appellate court cannot intrude upon the [agency's] domain...."[58] Given the prevalence of barter arrangements for children's programs,[59] we think it necessary for the Commission to devise a workable and legally supportable standard by which it may be ascertained whether such arrangements are so balanced in benefits to program producers and broadcasters, respectively, as to involve exchanges immunized from the requirement of sponsorship identification imposed by Section 317(a)(1). To this end, we remand this case to the Commission for further proceedings consistent with this opinion.

*So ordered.*

---

57. Post-hoc explanations of agency counsel, however compelling, cannot supply the agency's rationale for its decision. E.g., *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443, 462 (1983).

58. *SEC v. Chenery Corp.,* 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626, 633 (1943); see also *Brown v. Bowen,* 253 U.S.App.D.C. 409, 414 n. 7, 794 F.2d 703, 708 n. 7 (1986).

59. See note 11 *supra.*