**CONNECTICUT DEPARTMENT OF PUBLIC UTILITY CONTROL and Richard Blumenthal, Attorney General of the State of Connecticut, Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

**Springwich Cellular Limited Partnership; Cellco Partnership; GTE Service Corporation; McCaw Cellular Communications, Inc.; Connecticut Telephone and Communication Systems, Inc.; Connecticut Mobilecom, Inc.; Cellular Telecommunications Industry Association; and AT & T Wireless Services, Inc., Intervenors.**

**No. 1001, Docket 95–4108.**

United States Court of Appeals, Second Circuit.

Argued Oct. 31, 1995.

Decided March 22, 1996.

Mark F. Kohler, Asst. Atty. Gen., New Britain, Conn. (Richard Blumenthal, Atty. Gen. of Conn., Phillip Rosario, Asst. Atty. Gen., New Britain, Conn., on the brief), for petitioners.

Susan L. Fox, Washington, D.C. (William E. Kennard, Gen. Counsel, Daniel M. Armstrong, Assoc. Gen. Counsel, John E. Ingle, Dep. Assoc. Gen. Counsel, Laurence N. Bourne, Fed. Commun. Comm., Washington, D.C.; Anne K. Bingaman, Asst. Atty. Gen., Robert B. Nicholson, Andrea Limmer, U.S. Dept. of Justice, Washington, D.C., on the brief), for respondents.

Paul E. Knag, Hartford, Conn. (William H. Narwold, Charles D. Ray, Cummings & Lockwood, Hartford, Conn.; Douglas L. Povich, W. Ashby Beal, Kelly & Povich, Washington, D.C., on the brief), for intervenors Connecticut Telephone and Communication Systems, Inc. and Connecticut Mobilecom, Inc.

Jean L. Kiddoo, Washington, D.C. (Robert V. Zener, Swidler & Berlin, Washington, D.C.; Peter J. Tyrrell, Springwich Cellular Limited Partnership, New Haven, Conn.; Mark R. Kravitz, Wiggin & Dana, New Haven, Conn., on the brief), for intervenor Springwich Cellular Limited Partnership.

(Allan B. Taylor, Day, Berry & Howard, Hartford, Conn., submitted a brief for intervenor Cellco Partnership).

(Douglas B. McFadden, Robert M. Winteringham, McFadden, Evans & Sill, Washington, D.C.; Andre J. Lachance, GTE Service Corporation, Washington, D.C., submitted a brief for intervenor GTE Service Corporation).

(David L. Foster, Wilkie Farr & Gallagher, New York, N.Y.; Michael F. Altschul, Andrea D. Williams, Cellular Telecommunications Industry Association, Washington, D.C., submitted a brief for intervenor Cellular Telecommunications Industry Association).

(Bruce D. Sokler, Howard J. Symons, Sara F. Seidman, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, Washington, D.C., submitted a brief for intervenor AT & T Wireless Services, Inc.).

Before NEWMAN, Chief Judge, McLAUGHLIN, Circuit Judge, and RAGGI, District Judge.*

JON O. NEWMAN, Chief Judge:

This petition to review an order of the Federal Communications Commission challenges the lawfulness of the Commission's denial of Connecticut's request to continue state regulation of wholesale rates for cellular telephone service. Petitioners, the Connecticut Department of Public Utility Control ("DPUC") and the Attorney General of Connecticut, contend that the Federal Communications Commission ("FCC" or the "Commission") acted in an arbitrary and capricious manner by evaluating the DPUC's petition under a standard substantively different from the governing statute and the guidelines previously articulated by the FCC for evaluating state petitions. Petitioners also contend that the FCC's rejection of the DPUC's petition was not supported by the record. Finding no merit in any of petitioners' contentions, we affirm the Commission's order.

### Background

#### A. Statutory and Regulatory Scheme

In the mid–1970s, the FCC set aside radio frequencies for the development of cellular telephone service. Initially the Commission anticipated licensing one cellular telephone system in each community, which would be operated by the local telephone company. *See generally National Ass'n of Regulatory Utility Commissioners v. FCC*, 525 F.2d 630, 636–37 (D.C.Cir.), *cert. denied*, 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976). In the 1980s, in order to service increased demand and promote competition, the Commission decided to increase the spectrum allocation and, in each market, to divide the allocated spectrum among two competing "facilities-based" cellular carriers. The Commission thereby created a duopolistic market structure for the cellular industry. To encourage an extra measure of competition and to combat price discrimination, the Commission

prohibited the facilities-based carriers from restricting resale of their cellular capacity. *See generally Cellnet Communication, Inc. v. FCC*, 965 F.2d 1106, 1108 (D.C.Cir.1992).

As part of the Omnibus Budget Reconciliation Act of 1993 (the "Budget Act"), Pub.L. No. 103–66, 107 Stat. 312 (1993) (codified in relevant part at 47 U.S.C. § 332 (Supp. V 1993)), Congress amended the Communications Act of 1934, ch. 652, 48 Stat. 1064 (codified as amended at 47 U.S.C. §§ 151 *et seq.* (1988 & Supp. V 1993)), to dramatically revise the regulation of the wireless telecommunications industry, of which cellular telephone service is a part. Prior to 1993, the FCC had distinguished between common carrier service and private carrier service, and had regulated the former to a much greater degree than the latter. Because of the way in which the FCC had defined "private carrier" service, the FCC had created the troubling prospect of direct competition between largely unregulated private carriers and heavily regulated common carriers. In addition, there was considerable uncertainty as to whether providers of various new technologies would be classified as common or private carriers. *See generally* Second Report and Order, *Implementation of Sections 3(n) and 332 of the Communications Act*, 9 FCC Rcd 1411, 1414–16 (1994) (hereinafter the *"Second CMRS Order"*). Against this background Congress enacted section 332 of the Communications Act to "replace[ ] traditional regulation of mobile services with an approach that brings all mobile service providers under a comprehensive, consistent regulatory framework...." *Id.* at 1417.

Section 332 accomplished several changes. First, Congress created new statutory classifications of "commercial" and "private" mobile radio services (respectively, "CMRS" and "PMRS"). CMRS includes all mobile services operated for profit that solicit for subscribers and are interconnected with the public switched network, which is the traditional land-line telephone service. 47 U.S.C. §§ 332(d)(1) & (2). PMRS includes all wire-

---

* The Honorable Reena Raggi of the United States District Court for the Eastern District of New York, sitting by designation.

less services that do not meet the definition for CMRS. 47 U.S.C. § 332(d)(3).

Second, Congress allowed private services to remain unregulated, but created a new regulatory scheme to govern commercial services. Pertinent to this proceeding, Congress provided a general preemption of state rate regulation for both PMRS and CMRS: "[N]o State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services." 47 U.S.C. § 332(c)(3)(A).[1]

As an exception to the general preemption of state rate regulation, however, Congress provided that a state may petition the FCC for permission to regulate the rates for CMRS. *Id.* Additionally, a state that had rate regulation in effect on June 1, 1993, could petition the FCC, no later than August 9, 1994, to maintain its regulatory authority, in which event such regulatory authority would remain in effect until the Commission ruled on the petition. 47 U.S.C. § 332(c)(3)(B). Congress directed the Commission to grant the state's petition if the state demonstrates that "market conditions with respect to such services fail to protect subscribers adequately from unjust and unreasonable rates or rates that are unjustly or unreasonably discriminatory...." 47 U.S.C. §§ 332(c)(3)(A)(i) & (B).

In implementing various provisions of the Budget Act, the Commission issued the *Second CMRS Order,* adopted pursuant to appropriate informal rule-making procedures, in which it outlined its interpretation of the policy objectives underlying Congress's new statutory scheme for mobile radio services. 9 FCC Rcd 1411. The Commission first noted "the congressional intent of creating regulatory symmetry among similar mobile services." *Id.* at 1413. The Commission continued,

While we recognize that states have a legitimate interest in protecting the interests of telecommunications users in their jurisdictions, we also believe that competition is a strong protector of these interests and that state regulation in this context could inadvertently become as [*sic*] a burden to the development of this competition.

*Id.* at 1421. Accordingly, the Commission established "as a principal objective, the goal of ensuring that unwarranted regulatory burdens are not imposed upon any mobile radio licensees who are classified as CMRS providers by this Order." *Id.* at 1418.

The *Second CMRS Order* included guidelines for state petitions seeking to retain or institute regulatory authority over commercial wireless rates under section 332(c)(3). First, the Commission determined that "[a]ny state filing a petition pursuant to Section 332(c)(3) shall have the burden of proof that the state has met the statutory basis for the establishment or continuation of state regulation of rates." *Id.* at 1504; *see also* 47 C.F.R. § 20.13(a)(5) (1995) (regulations codifying the *Second CMRS Order* ). Second, the Commission identified the following eight types of "evidence, information, and analysis" as "pertinent to [its] examination of market conditions and consumer protection":

(1) The number of CMRS providers in the state, the types of services offered by these providers, and the period of time during which these providers have offered service in the state.

(2) The number of customers of each such provider, and trends in each provider's customer base during the most recent annual period ..., and annual revenues and rates of return for each such provider.

(3) Rate information for each CMRS provider, including trends in each provider's rates during the most recent annual period....

(4) An assessment of the extent to which services offered by the CMRS providers that the state proposes to regulate are

1. Congress also gave the FCC authority to specify that certain types of federal regulation, including tariff filing requirements, would be inapplicable to CMRS. 47 U.S.C. § 332(c)(1)(A). The Commission subsequently decided to forbear from federal tariff regulation of cellular services. *Second CMRS Order,* 9 FCC Rcd at 1418.

substitutable for services offered by other carriers in the state.

(5) Opportunities for new entrants that could offer competing services, and an analysis of existing barriers to such entry.

(6) Specific allegations of fact (supported by an affidavit of a person or persons with personal knowledge) regarding anti-competitive or discriminatory practices or behavior on the part of CMRS providers in the state.

(7) Evidence, information, and analysis demonstrating with particularity instances of systematic unjust and unreasonable rates, or rates that are unjustly or unreasonably discriminatory, imposed upon CMRS subscribers. Such evidence should include an examination of the relationship between rates and costs. . . .

(8) Information regarding customer satisfaction or dissatisfaction with services offered by CMRS providers, including statistics and other information regarding complaints filed with the state regulatory commission.

*Second CMRS Order*, 9 FCC Rcd at 1504–05; *see also* 47 C.F.R. § 20.13(a)(2). The Commission also provided that states could submit whatever additional information they thought relevant. *Second CMRS Order*, 9 FCC Rcd at 1504.

## B. The DPUC Petition

Connecticut has regulated wholesale cellular providers since 1986 and therefore was eligible to petition the FCC for continued regulatory authority over the rates of cellular carriers under section 332(c)(3)(B). In late 1993 the DPUC conducted an investigation into the Connecticut cellular service market in order to determine whether market conditions would adequately protect consumers from unjust or unreasonable rates.

█ On August 8, 1994, the DPUC issued a decision analyzing the Connecticut cellular market in light of the factors specified in the *Second CMRS Order*. *See* Decision, *DPUC Investigation into the Connecticut Cellular Service Market and the Status of Competition*, Docket No. 94–03–27 (Aug. 8, 1994) (hereinafter the *"DPUC Decision"*). Although the DPUC did not make conclusive findings that the carriers' rates of return or rate structures were unreasonable or discriminatory, it listed evidence that it found indicated the need for further review. The DPUC also determined that the cellular market was highly concentrated and would not be subject to competition for several years because of barriers to entry such as high start-up costs and the lack of adequate substitutes for cellular service. In addition, the DPUC found that the cellular carriers had engaged in anti-competitive practices including: "upside-down pricing," [2] preferential treatment of their retail affiliates, and sharing confidential reseller marketing information with their retail affiliates. The DPUC concluded that regulation of wholesale cellular rates "should continue until it can be satisfactorily demonstrated that wireless service providers are effectively in operation and that true competition is present in the CMRS marketplace." *DPUC Decision* at 18–19.

Upon issuing its report, the DPUC filed a timely petition with the FCC summarizing the conclusions contained in the *DPUC Decision*. *See Petition of the Connecticut Department of Public Utility Control to Retain Regulatory Control of the Rates of Wholesale Cellular Service Providers in the State of Connecticut*, PR Docket No. 94–106 (August 8, 1994) (hereinafter the *"DPUC Petition"*).[3] In the *DPUC Petition*, the DPUC sought to retain authority to regulate wholesale cellular rates until July 1996, at which time the DPUC intended to begin a review of Connecticut market conditions. The petition also sought to retain existing authority through October 1997 in the event that, after the contemplated review, the DPUC found that market conditions were still inadequate to

---

**2.** "Upside-down pricing" is the practice by which the wholesale carriers' retail affiliates offer pricing plans to end-users with rates that are less than the rates at which the resellers can purchase bulk service from their wholesale providers.

**3.** The *DPUC Petition* is a document of advocacy. It was not adopted as a formal opinion of the DPUC. We look to the *DPUC Decision* for the findings of the DPUC.

protect consumers. The DPUC did not seek to regulate retail cellular rates.

## C. FCC Order

The FCC denied the *DPUC Petition* by order adopted May 8, 1995. *See* Report and Order, *Petition of the Connecticut Department Public Utility Control to Retain Regulatory Control of the Rates of Wholesale Cellular Service Providers in the State of Connecticut,* 10 FCC Rcd 7025 (1995) (hereinafter the *"FCC Order"*). The Commission noted that section 332 "express[es] an unambiguous congressional intent to foreclose state regulation in the first instance." *Id.* at 7030. The Commission then explained that a state would "not be allowed to continue regulating CMRS overall, or cellular service in particular, merely by demonstrating that the market for cellular service has been less than fully competitive." *Id.* at 7032. Since "Congress was aware of the duopoly cellular structure when it generally proscribed state regulation," *id.* at 7035, "[s]uch a standard would effectively allow an exception permitting regulation to nullify a general prohibition against it . . . ," *id.* at 7032. The Commission went on to discuss the impending competition from providers of new technology such as personal communications services ("PCS"), and stated that cellular companies have already prepared for new competition by lowering prices. *Id.* at 7037–39.

Applying these general considerations to the *DPUC Petition,* the Commission ruled that the DPUC had not sustained its burden of demonstrating that market conditions failed to protect consumers. The Commission based its denial of the petition in significant part on the fact that in the *DPUC Decision,* the DPUC had not made a finding that wholesale cellular rates were unreasonable or discriminatory, but instead had stated that its findings regarding the carriers' rates of return and overall pricing behavior were "inconclusive" and required further review. Moreover, during the significant period of time between the filing of the *DPUC Petition* and the issuing of the *FCC Order,* the DPUC had not initiated any additional

review. As other bases for denial, the Commission's order cited: evidence that cellular rates in Connecticut are declining, the DPUC's failure to consider changes to the cellular industry's traditionally concentrated market structure from the anticipated competition provided by PCS and other new technologies, the lack of evidence of systematically collusive or other anticompetitive practices, the lack of evidence of widespread customer dissatisfaction, and the lack of analysis of the investment practices of cellular licensees. *Id.* at 7056–57. We discuss other details of the Commission's order as necessary below.

## D. Appeal

Forgoing an opportunity to seek reconsideration of the *FCC Order,* the DPUC filed the instant petition for review, pursuant to 47 U.S.C. § 402(b)(6) (1988). A motion to stay the effectiveness of the *FCC Order* was denied.

A number of parties were given leave to intervene. Connecticut Telephone and Communication Systems, Inc. and Connecticut Mobilecom, Inc., independent resellers of cellular service, filed a brief in support of petitioners. Filing briefs on the side of the FCC were wholesale cellular carriers Springwich Cellular Limited Partnership and Cellco Partnership (a successor-in-interest to Bell Atlantic Metro Mobile), GTE Service Corporation, AT & T Wireless Services, Inc., and the Cellular Telecommunications Industry Association.[4]

The DPUC argues that this Court should reverse the Commission's order because the Commission evaluated the *DPUC Petition* under a standard that deviated from the statute and the Commission's previously announced criteria for evaluating state petitions, and because the Commission's determination that the DPUC failed to sustain its burden of proof in demonstrating the need for continued rate regulation is not supported by the record.

### Discussion

## A. Standards for review

■ A court may reverse agency action only upon a showing that the decision was

---

4. Intervenor McCaw Cellular Communications, Inc. did not file a brief.

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1994). An agency's action is arbitrary and capricious if the agency relies on factors that Congress did not intend it to consider, fails to consider an important factor, or offers an explanation for its decision that is contrary to the evidence before the agency. *See Motor Vehicle Manufacturers Ass'n of the United States v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983). This Court has recently stated that "the general standard of review to be applied in connection with final orders of the FCC is a 'highly deferential one.'" *Fulani v. FCC*, 49 F.3d 904, 908 (2d Cir.1995) (quoting *Capital Telephone Co. v. FCC*, 777 F.2d 868, 870 (2d Cir.1985)).

B.  Claim of improper standards

■ The DPUC contends that the Commission acted in an arbitrary or capricious manner because the Commission denied the Connecticut petition for reasons not entirely consistent with the requirements of section 332 and different from those specified in the *Second CMRS Order*. As a threshold matter, the Commission responds that DPUC's claim is barred from judicial review by 47 U.S.C. § 405 (1988) because the DPUC never raised this objection in a petition for reconsideration with the Commission.[5]

Section 405, however, requires that reconsideration be sought only when the Commission has not already had a fair opportunity to consider the legal arguments presented by petitioner. In the proceeding below, in determining that the DPUC failed to meet its burden of proof, the Commission necessarily considered the appropriate standard for evaluating a state's petition. The DPUC's argument that the Commission applied an improper standard "merely [ ] challenge[s] the validity of the reasoning by which the Commission reached its decision." *MCI Telecom-*

*munications Corp. v. FCC*, 10 F.3d 842, 846 (D.C.Cir.1993) (citing *National Ass'n for Better Broadcasting v. FCC*, 830 F.2d 270, 274–75 (D.C.Cir.1987)).

Moreover, even if the DPUC should have sought reconsideration with the Commission, the futility exception to the exhaustion requirement applies in this instance. Before this Court, the Commission contends that the DPUC had full notice that the Commission would rely for its evaluation on the type of evidence to which petitioner now objects. Accordingly, by its arguments before this Court, "[t]he Commission has made clear that it believes that it had the legal authority to decide what it did and in the manner it did." *All America Cables & Radio, Inc. v. FCC*, 736 F.2d 752, 761 (D.C.Cir.1984). The application of section 405's exhaustion requirement would serve no purpose in this case.[6] Accordingly, we turn to the merits of the DPUC's argument.

■ The DPUC's first contention is that the Commission acted improperly in relying in part on the DPUC's failure to present evidence demonstrating that the cellular carriers had engaged in insufficient reinvestment of profits. Reliance on this factor is challenged because investment practices were not included within the eight categories of information considered relevant in the *Second CMRS Order*. Even if we were to agree with the DPUC that the Commission had not provided notice to the states that investment information would be important to the evaluation of state petitions, that determination would not be dispositive because the Commission articulated a number of other independent bases for its denial of the *DPUC Petition*.

In any event, the Commission did not confine itself to considering only information falling within the eight categories listed in the *Second CMRS Order*. Rather, the Com-

---

**5.** Section 405 provides:

The filing of a petition for reconsideration shall not be a condition precedent to judicial review of any [Commission] order ... except where the party seeking such review ... relies on questions of fact or law upon which the Commission, or designated authority within the

Commission, has been afforded no opportunity to pass.

47 U.S.C. § 405 (1988).

**6.** In fact, the Commission denied the two petitions for reconsideration filed by states that similarly had sought to retain regulatory authority over the rates of cellular carriers.

mission permitted a state "to submit whatever evidence the state believes is persuasive regarding market conditions in the state and the lack of protection for CMRS subscribers in the state." *Second CMRS Order,* 9 FCC Rcd at 1504. The Commission provided the list of eight categories only as a guide to states in drafting their petitions, and specified that the list was "non-exhaustive." 47 C.F.R. § 20.13(a)(2) (regulations codifying the *Second CMRS Order*). While the Commission's denial of a petition based solely on factors outside the eight categories might be arbitrary, the Commission's consideration of some information not within the eight categories does not render its order improper.

Moreover, as the Commission argues, the evidence described in the eight categories arguably encompasses evidence pertaining to reinvestment of profits. For example, the category pertaining to carriers' rates, which includes an "examination of the relationship between rates and costs," 47 C.F.R. § 20.13(a)(2)(vii), could easily be deemed to include investment information—just as high costs might explain high rates, so too could reinvestment of profits. Similarly, the consumer complaints category could have included evidence of inadequate cellular facilities or technologies, resulting from lack of investment.

In addition, although not specifically listed within the eight categories of information considered pertinent, the Commission had strongly indicated its interest in the state of investment in the cellular industry. For example, in the *Second CMRS Order,* the Commission stated that it "is essential that our policies promote robust investment in mobile services." 9 FCC Rcd at 1421. The Commission continued, "Our preemption rules will help promote investment in the wireless infrastructure by preventing burdensome and unnecessary state regulatory practices. . . ." *Id.* Such references to the importance of investment provided sufficient notice to the DPUC that the Commission would consider investment activity in its evaluation of a state's market conditions. For the Commission to articulate the lack of evidence regarding deficient investment practices as one of the bases for its denial of the *DPUC Petition* was not arbitrary.

■ Second, the DPUC contends that in denying its petition the Commission considered future rather than current market conditions, and that such a focus is inconsistent with the dictates of section 332.[7] Congress allowed a state to retain regulatory authority over CMRS rates on a showing that market conditions fail adequately to protect consumers. 47 U.S.C. §§ 332(c)(3)(A)(i) & (B). The DPUC argues that, while the statute plainly contemplates an analysis of market conditions as they currently exist within a particular state, the Commission denied Connecticut's petition because it determined that, in the future, market conditions would be such that consumers would be adequately protected.

Although the Commission in its decision denying the *DPUC Petition* certainly displayed a forward looking perspective, we do not agree that the Commission denied the Connecticut petition because future market conditions will adequately protect *future* customers. Rather, the Commission considered the effect of imminent future competition on *current* market conditions. For example, as part of its consideration of the present-day effects of PCS, the Commission noted that "[a]vailable evidence indicates that cellular companies, faced with the near-term entry of PCS, have reacted by preparing for impending competition, *i.e.,* by lowering prices and adopting new technologies. . . . The advent of PCS [ ] appears unambiguously to be having an impact on the present marketplace. . . ." *FCC Order* at 7038–39. It is entirely appropriate for the Commission to take into account the present-day impact of future market entry in evaluating whether

---

7. With respect to future market conditions, the FCC stated in part:

> [A] state must do more than merely show that market conditions for cellular service have been less than fully competitive in the past. In order to retain regulatory authority, a state must show that, given the rapidly evolving market structure in which mobile services are provided, the conduct and performance of CMRS providers ill-serve consumer interests by producing rates that are not just and reasonable, or are unreasonably discriminatory.

> *FCC Order* at 4 (footnote omitted).

current market conditions are inadequate to protect consumers. *Cf. United States v. Waste Management, Inc.*, 743 F.2d 976, 979 (2d Cir.1984) (acknowledging, in context of antitrust action, that a market includes potential competitors). Doing so does not violate the statute or the standards contained in the *Second CMRS Order.*

Intervenor-petitioner Connecticut Telephone raises an additional challenge to the Commission's standards for evaluating state petitions. Connecticut Telephone contends that, because the Commission noted that states must "clear substantial hurdles if they seek to continue or initiate rate regulation," *Second CMRS Order*, 9 FCC Rcd at 1421, the Commission improperly imposed on states a "heightened standard of proof." There is some question as to whether this issue is properly before this Court because it was raised by an intervenor rather than by petitioner. *See National Ass'n of Regulatory Utility Commissioners v. ICC*, 41 F.3d 721, 729–30 (D.C.Cir.1994) ("Intervenors may only argue issues that have been raised by the principal parties...."). In any event, the argument is without merit. It is reasonable to characterize as "substantial" the burden faced by a party seeking an exemption from a general statutory rule. Courts have used similar language in describing the difficulties of demonstrating entitlement to other statutory exemptions. *See, e.g., Turro v. FCC*, 859 F.2d 1498, 1499 (D.C.Cir.1988) ("An applicant for waiver faces a high hurdle even at the starting gate.") (quoting *WAIT Radio v. FCC*, 418 F.2d 1153, 1157 (D.C.Cir.1969)). To hold that use of such language modifies the burden of proof is to elevate a passing reference to overarching significance.

C. Insufficiency of the DPUC's presentation

In order to retain its regulatory authority over cellular rates, Connecticut had the burden of demonstrating that "market conditions with respect to [cellular] services fail to protect subscribers adequately from unjust and unreasonable rates or rates that are unjustly or unreasonably discriminatory...." 47 U.S.C. §§ 332(c)(3)(A)(i) & (B). As the Commission correctly pointed out, the DPUC never made a finding in its own proceeding that present wholesale cellular rates in Connecticut are unreasonable or discriminatory, but instead acknowledged that its findings were inconclusive and required further investigation. On this basis alone the record supports the Commission's conclusion that Connecticut failed to sustain its burden of proof in demonstrating the need for continued regulatory authority over the rates of cellular providers. We find no support for the DPUC's argument before this Court that the FCC ignored or distorted the DPUC's findings. Indeed, at oral argument the DPUC conceded that it never made a finding that the carriers' rates were unjust or unreasonable. The other deficiencies in the *DPUC Petition*, accurately detailed in the *FCC Order*, provide additional support for the Commission's order.

We have considered all of the arguments raised by DPUC and the intervenors who side with it, and find the arguments to be without merit. Accordingly, the petition for review is denied.