NORTHWESTERN INDIANA TELEPHONE COMPANY, INC., et al., Appellants,

v.

FEDERAL COMMUNICATIONS COMMISSION, Appellee.

No. 85–1542.

United States Court of Appeals, District of Columbia Circuit.

Argued March 19, 1987.

Decided July 31, 1987.

Russell D. Lukas, with whom David L. Nace and Theresa Fenelon, Washington, D.C., were on brief, for appellants. Pamela L. Gist, Washington, D.C., also entered an appearance for appellants.

Nancy E. Stanley, Counsel, F.C.C., with whom Jack D. Smith, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel and C. Grey Pash, Jr., Counsel, F.C.C., Catherine G. O'Sullivan and Marion L. Jetton, Attys., Dept. of Justice, Washington, D.C., were on brief, for appellee. Gerald E. Goldstein, Counsel, F.C.C., Washington, D.C., also entered an appearance for appellee.

Before BORK and SILBERMAN, Circuit Judges, and FRIEDMAN,[*] Circuit Judge, United States Court of Appeals for the Federal Circuit.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

This case involves a dispute between the Federal Communications Commission ("FCC"), a telephone company in Indiana owned by an individual named Robert Mussman, and a cable television company owned and managed by Robert Mussman's son Rhys. Northwestern Indiana Telephone Company ("NITCO"), and Northwest Indiana CATV, Inc. ("Northwest"), the cable company, petition this court to review decisions by the FCC holding that the two companies violated the agency's telephone/cable cross-ownership rules, 47 C.F.R. § 63.54 (1986), as well as section 214(a) of the Communications Act of 1934, 47 U.S.C. § 214(a) (1982). The FCC decided that NITCO and Northwest were "affiliates," making NITCO's agreement to construct cable television facilities for Northwest in its telephone service area, and NITCO's lease of telephone pole space to Northwest, violations of the Commission's rules. The FCC also held that NITCO violated the statute by failing to obtain certification from the Commission before constructing the cable television facilities for Northwest. Because the Commission's

---

[*] Sitting by designation pursuant to 28 U.S.C. § 291(a).

finding of "affiliation" was based in part on criteria that appear inconsistent with the Commission's own rules and precedent, we remand the case for further explanation.

## I.

A cable television operator transmits signals to customers by way of coaxial cable. The cable operator first collects the signals from the airwaves with an antenna or microwave receiver, amplifies and converts them using a "headend" device, and then sends them along a branching series of distribution cables until they ultimately reach the homes of individual subscribers. A cable operator usually gains access to the required distribution cables in one of three ways. The most expensive option is for the cable operator to build its own facilities. Alternatively, it can lease space on existing telephone poles and string its own cables along the poles. Or the telephone company can itself install, own and operate the cables and transmit signals for the cable operator by offering a "channel distribution" service. *See General Tel. Co. of California v. FCC*, 413 F.2d 390, 393 (D.C.Cir.), *cert. denied*, 396 U.S. 888, 90 S.Ct. 173, 24 L.Ed.2d 163 (1969). Northwest, the cable operator in this case, chose what appears to be a combination of the second and third options: although Northwest owns the facilities, NITCO, the local telephone company, not only leased space on its poles, but actually installed the cable lines as well.

A competitor of Northwest complained to the FCC in 1983 that NITCO and Northwest were engaged in conduct prohibited by the Commission's rules governing affiliations between telephone companies and cable operators, and contended that NITCO had improperly constructed the cable facilities for Northwest without obtaining a certificate from the Commission. In response, NITCO and Northwest denied that a certificate was required, and also denied any affiliation. NITCO and Northwest did acknowledge, however, a number of past and current business relations between the two companies (or their principals) in addition to the lease of pole space and construction of the cable facilities. These transactions included: Robert Mussman's lease of office space to Northwest; NITCO's lease of land used as the site of Northwest's antennas and other cable equipment; a paid consulting agreement between Rhys Mussman and NITCO; Robert Mussman's personal guarantee of $450,000 in bank loans made to Northwest, and of Rhys' agreement to indemnify one of the localities served by Northwest against costs arising from litigation involving Northwest; and Northwest's use of NITCO's post office box and mailing address. The two companies also admitted that Rhys had (falsely) represented to various town officials that Robert Mussman was an officer of Northwest.

In an opinion released on March 18, 1985, the Commission determined that NITCO and Northwest were affiliates within the meaning of the FCC's telephone/cable cross-ownership rules. *See Comark Cable Fund III*, 100 F.C.C.2d 1244 (1985). These rules prohibit a telephone company from furnishing cable television to the public in the telephone company's telephone service area, either directly, or indirectly through an affiliated cable company, including renting pole space to an affiliate. 47 C.F.R. § 63.54.[1] Note 1(a) to the rules defines the term "affiliate" as including "any financial or business relationship whatsoever by contract or otherwise, directly or indirectly, between the carrier and the customer, except only the carrier-user relationship."

---

**1.** The cross-ownership rules are as follows:
(a) No telephone common carrier ... shall engage in the furnishing of cable television service to the viewing public in its telephone service area, either directly, or indirectly through an affiliate owned by, operated by, controlled by, or under common control with the telephone common carrier.
(b) No telephone common carrier ... shall provide channels of communications or pole line conduit space, or other rental arrange-

ments, to any entity which is directly or indirectly owned by, operated by, controlled by, or under common control with such telephone common carrier, where such facilities or arrangements are to be used for, or in connection with, the provision of cable television services to the viewing public in the telephone service area of the telephone common carrier.
47 C.F.R. § 63.54 (1986).

The Commission stated that five of the interconnections NITCO and Northwest had admitted—the loan guaranty; the guaranty of the indemnification agreement; the consulting contract; the public representations as to Robert Mussman's role in Northwest; and *the agreements to construct Northwest's cable television systems*—"together with all the other facts set forth" in the decision, led to the conclusion that NITCO and Northwest were affiliates. 100 F.C.C.2d at 1253. Because Northwest was an affiliate, NITCO had violated the FCC rules by leasing pole space to Northwest and by constructing and maintaining the three cable television systems for Northwest. The Commission also decided that NITCO had not legally constructed cable facilities for the transmission of broadcast television signals since it lacked a certificate required by 47 U.S.C. § 214(a),[2] and therefore ordered NITCO to terminate all affiliations with Northwest and to divest all the cable facilities.

NITCO asked the Commission to reconsider, arguing, *inter alia,* that the FCC's reasoning was inconsistent with a FCC opinion, released only weeks earlier, in which the Commission authorized a telephone company to construct channel distribution facilities to be partially owned by a cable operator without finding that the transaction created an affiliation under Note 1(a) of the cross-ownership rules. *See The Chesapeake and Potomac Telephone Co.,* 57 Rad.Reg.2d 1003 (1985) (*"C & P"*). The Commission denied reconsideration, explaining that unlike the present case the C & P transaction "involved a 'carrier-user relationship' within the meaning of the sole exception to the broad language in Note 1(a)." *Comark Cable Fund*

*III,* 103 F.C.C.2d 600, 609 (1985). The FCC reiterated four of the five relationships emphasized in the first decision (but not Rhys Mussman's public statements) and added three more to the list: the lease of office space to Northwest; the lease of land for Northwest's cable equipment; and *NITCO's lease of telephone pole space to Northwest.* Although the FCC's first opinion had based the determination of affiliation on "all of the ... facts" taken together, the opinion denying reconsideration stated that "each of [the seven listed relationships] was and continues to be prohibited by Section 63.54," suggesting that any one of the relationships alone would create an affiliation. 103 F.C.C.2d at 602.[3]

NITCO and Northwest thereafter filed their petition for review in this court and, while the petition was pending, requested that the Commission stay its order. The Commission subsequently issued a third opinion, granting the stay but conditioning it on terms that NITCO and Northwest declined to accept.

## II.

The FCC's telephone/cable company cross-ownership rules define "affiliate" in sweeping terms, covering, as we have noted, telephone companies and cable operators that have "any financial or business relationship whatsoever." 47 C.F.R. § 63.-54 Note 1(a). The rules contain an exception, however, for the "carrier-user relationship," which apparently refers to the offerings of a common carrier. NITCO and Northwest argue that this "carrier-user" exception is ill-defined and has been interpreted inconsistently by the FCC to authorize certain relationships between favored applicants but prohibit similar relationships between others. In the present

---

**2.** Section 214(a) reads:

No carrier shall undertake the construction of a new line or of an extension of any line, or shall acquire or operate any line, or extension thereof, or shall engage in transmission over or by means of such additional or extended line, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or ex-

tended line.... [T]he term "line" means any channel of communication established by the use of appropriate equipment....

47 U.S.C. § 214(a) (1982).

**3.** The FCC's brief before this court adheres to the approach of the first opinion, stating "[I]t was reasonable for the Commission to conclude that *the overall picture* presented by all of its factual findings warranted a determination" that NITCO and Northwest were affiliates. Brief of Respondents at 33 (emphasis added).

case, petitioners argue, several of the transactions between NITCO and Northwest listed by the Commission are almost identical to transactions that fell within the "carrier-user" exception in C & P and other cases. Although an agency's reasonable interpretation of its own rules is normally due deference, *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), we agree, in light of C & P, that the Commission's treatment of at least two of those transactions—NITCO's lease of telephone space to Northwest, and NITCO's agreement to construct and maintain Northwest's cable facilities—is in need of further explanation.[4]

■ The Commission's claim that NITCO's lease of pole space to Northwest supports a finding of affiliation between the companies is on its face inconsistent with the very language of the cross-ownership rules. Section 63.54(b) of the rules prohibits a telephone company from renting telephone pole space to an affiliated cable operator. It obviously follows that a telephone company can offer pole space to a cable operator that is unaffiliated. Indeed, a different section of the rules actually *requires* a telephone company to lease pole space under certain circumstances. *See* 47 C.F.R. § 63.57. If renting pole space converts the lessee into an affiliate of the lessor, as the Commission's opinion suggests, a *telephone company would be prohibited by the rules from ever renting pole space to any cable company at all.* We simply cannot understand, then, how the lease of pole space by itself could be evidence of affiliation.

■ The significance of NITCO's construction of cable facilities for Northwest is more uncertain. We start with the undisputed proposition that a telephone company may construct, maintain and own channel distribution facilities and use them to transmit television signals for *independent* cable operators without running afoul of the Commission's cross-ownership rules.[5] That is so because early in the history of cable television regulation the Commission decided that a telephone company undertakes only a common carrier service when it transmits, using its own facilities, television signals for cable operators. *See Common Carrier Tariffs for CATV Systems,* 4 F.C.C.2d 257, 260 (1966). *See also General Tel. Co. of California,* 13 F.C.C.2d 448, 454, *reconsid. denied,* 14 F.C.C.2d 170 (1968), *aff'd,* 413 F.2d 390, *cert. denied,* 396 U.S. 888, 90 S.Ct. 173, 24 L.Ed.2d 163 (1969). The Commission thus treats a channel distribution service as falling within the "carrier-user" exception to the Note 1(a) definition of affiliate.

But judging from the Commission's recent decision in C & P, the carrier-user exception is evidently not limited to the provision of channel distribution services. In that case, the telephone company, C & P, proposed to construct and maintain channel distribution facilities on telephone pole space leased by a cable operator, and to retain legal title to the facilities. The otherwise unaffiliated cable operator agreed to pay C & P for the cost of construction (over a period of four years), assume some of the risks and benefits of ownership, and use the transmission sys-

4. In addition to their contention that the FCC has interpreted the "carrier-user" exception inconsistently, NITCO and Northwest also argue that the cross-ownership rules are so unclear as to not give adequate prior notice of the standards by which telephone and cable companies are expected to guide their conduct. The relations at issue in this case, however, were initiated long before the release of C & P in January, 1985, and prior to C & P the cross-ownership rules appeared less uncertain. Although the Commission had never issued a decision (of which we are aware) explicitly interpreting the "carrier-user" exception, we do not see how petitioners could reasonably have believed that *all* of their interconnections fell within that exception.

5. *See* 47 C.F.R. § 63.54(b) (barring telephone companies from providing "channels of communication" to affiliated cable operators—but not all cable operators). *See also* 47 C.F.R. § 63.57 (telephone companies may "construct and/or operate distribution facilities for channel service to ... independent cable systems" if the cable operators are first given the option of renting pole space); *Eagle Telecommunications, Inc.,* 54 Rad.Reg.2d 1124, 1126 n. 3 (1983), *reconsid. granted,* 59 Rad.Reg.2d 1243 (1985) ("[T]he ban [in section 63.54(a)] is against the carrier furnishing programming. The carrier may construct cable television facilities within its telephone service area and offer them under tariff to another who would provide service to customers").

tem for substantially all of its useful life. The Commission approved the transaction, explaining that "[d]espite the broad language of [Note 1(a)] we do not believe that it prohibits C & P, the title owner of the facilities, from granting to [the cable operator] the tax benefits or other economic risks and benefits of ownership. C & P has no *control* over the cable provider or the cable service nor is there any common control over the two companies." 57 Rad. Reg.2d 1003, 1008 (1985) (emphasis added). In the present case—but not in *C & P* itself—the Commission described all aspects of the C & P/cable operator relationship as covered by the "carrier-user" exception to Note 1(a), because the transactions "involved a proposed tariff offering comparable to traditional common carrier tariffed channel service offerings." 103 F.C.C.2d at 610 n. 21. Here is our difficulty: in light of *C & P*, the boundaries of the "carrier-user" exception are not clear. The transaction in *C & P* included the transfer of certain attributes of ownership in channel distribution facilities, but nevertheless fell within the "carrier user" exception. The Commission has not adequately explained why a transfer of ownership rights *in toto*—as occurred in the present case—is treated differently.[6]

To be sure, the Commission cited factors other than the telephone pole leases and the construction agreements as evidence of affiliation between NITCO and Northwest. If it were apparent from the Commission's opinions that these other factors created an affiliation without regard to the lease and construction agreements, and that the divestiture remedy would have been selected on the basis of those other factors standing alone, we would review that determination without remanding.[7] But the Commission's opinions are not so clear. *See supra* p. 1208 and n. 3. Since we are reviewing an administrative agency, and not a district court, we cannot affirm on grounds other than those presented by the Commission itself. *See SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). We therefore, unfortunately, must prolong this dispute by remanding the case on this ground.[8]

As we noted above, NITCO built three cable television systems, each of which was to be owned and operated by Northwest. NITCO did not obtain a section 214 certificate from the Commission, and the FCC decided that NITCO was prohibited from constructing the channel distribution facilities without such authorization. Although

---

6. *The Ohio Bell Tel. Co.*, 1 FCC Rcd. 942 (1986), issued subsequent to the final decision in this case, supports our impression that the "carrier-user" exception has been considerably expanded. In *Ohio Bell*, the Commission approved a telephone company's proposal to construct and maintain channel distribution facilities which (except for the "hub" portions physically located in the telephone company's offices) were to be sold outright to the cable operator. The cable operator apparently agreed to make a one-time payment to the telephone company for the cable lines and periodic payments (at a rate filed with the Commission under tariff) for maintenance of the lines and use of the "hub" facility. In response to an argument that the transaction violated the cross-ownership rules, the Commission stated only that "[t]he proposal does not materially differ from what other carriers have been authorized to construct. *See, e.g., C & P.*" 1 FCC Rcd. at 944. In a footnote to the decision, the Commission distinguished the present case by noting that here NITCO and Northwest had been deemed affiliates "as a result of one person owning the telephone company and providing guaranteed repayment of loans to his son's cable television company." *Id.* at 942 n. 4.

*Ohio Bell* might then suggest that the Commission no longer believes that a telephone company creates an affiliation with a cable operator merely by constructing distribution facilities that are to be owned by the cable operator (if that was ever the Commission's real position).

7. It may well be that only sloppy draftsmanship is to blame for the apparent inconsistencies in the Commission's decisions—but we cannot very well assume that.

8. NITCO and Northwest present two arguments challenging the validity of the Commission's 1970 telephone/cable cross-ownership rules upon which the Commission was never given an "opportunity to pass," and that we therefore cannot entertain. *See* 47 U.S.C. § 405 (1982); *Washington Ass'n for Television & Children v. FCC*, 712 F.2d 677, 681 (D.C.Cir.1983). First, in a supplemental brief submitted one week before oral argument, petitioners argue that the definition of "affiliate" in the rules violates the free speech protections of the First Amendment. But merely because petitioners' argument is constitutionally based does not, when the challenge is to an agency policy or regulation, en-

the Commission's brief maintains that NITCO would have needed a section 214 certificate even if Northwest had not been an "affiliate" (the Commission's position on this issue during the proceedings below was somewhat unclear), FCC counsel acknowledges a lack of precedent for this interpretation. Since all parties agree that a certificate would be required if NITCO and Northwestern are properly determined to be affiliated, we think it prudent to reserve judgment on this novel question. If on remand the FCC finds NITCO and Northwest to be affiliated we may not have to reach the issue.

■ NITCO's and Northwest's final argument is that the Due Process clause of the Fifth Amendment guarantees them an evidentiary hearing before they can be deprived of property by order of the Commission. We disagree. There can be no question that NITCO and Northwest each received notice of the specific charges in the proceedings below and each responded in writing on numerous occasions. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985). Moreover, the Commission explained that it viewed the evidence of affiliation in the light most favorable to petitioners. There was thus no material factual dispute before the agency, but rather, only disagreement as to the legal conclusions to be drawn from the version of the facts provided by petitioners. Due Process does not require a trial-type hearing under these circumstances. *See RKO General, Inc. v. FCC,* 670 F.2d 215, 231–32 (D.C.Cir. 1981).

This case is remanded for proceedings consistent with our opinion.

*So ordered.*

title a party to bypass statutory exhaustion requirements. *See Meredith Corp. v. FCC,* 809 F.2d 863, 872–74 (D.C.Cir.1987). Second, petitioners argue that the Commission's definition of affiliate is inconsistent with section 613(b) of the Cable Communications Policy Act of 1984, 47 U.S.C. § 533(b) (Supp. III 1985). Petitioners claim this second argument was "squarely raised" before the FCC in a submission made on

November 8, 1985 in connection with their September 16, 1985 petition for stay. J.A.1840. We disagree. To be sure, petitioners did point out that they were not affiliates under a separate definition found in the Act, but instead of arguing that the Commission was bound to apply the statutory definition, petitioners actually suggested that the Act did not even apply to this case because of the date it was enacted.