CENTURY FEDERAL, INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents, Pacific Bell, Intervenor.

No. 87–1046.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 12, 1987.

Decided May 20, 1988.

Jacob W. Mayer, Washington, D.C., for petitioner.

Gregory M. Christopher, Counsel, F.C.C., with whom Diane S. Killory, Gen. Counsel, F.C.C., Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Robert B. Nicholson, and Robert J. Wiggers, Attys., Dept. of Justice, Washington, D.C., were on the brief for respondents. Catherine O'Sullivan, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for respondents.

Margaret deB. Brown, Sarah J. Diehl, and Stanley J. Moore, San Francisco, Cal.,

were on the brief for intervenor Pacific Bell, urging affirmance.

Before EDWARDS, SILBERMAN, and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

This case presents a dispute between petitioner Century Federal, Inc. and the Federal Communications Commission concerning the FCC's approval of an application by Pacific Bell to construct a cable television transmission system for lease to a possible competitor of Century Federal, Cable Communications Cooperative ("CCC"). Century intervened in the proceeding before the FCC and urged the agency to disapprove Pacific's application. Century now petitions this court to review the Commission's denial of its request. Century claims that Pacific did not supply adequate financial justification for this undertaking, in violation of applicable regulations. Century also asserts that CCC is an affiliate of Pacific, and therefore the construction of the cable system violates the Commission's telephone/cable cross-ownership rules. Finally, Century contends that the proceedings before the Commission were marred by the receipt of impermissible *ex parte* communications. We deny Century's petition for review.

## I.

Century has encountered several obstacles in its effort to offer cable television services to residents of Palo Alto, California. A cable television operator must have access to a distribution network in order to provide service to individual subscribers. This access can be obtained in one of three ways. The operator can build its own distribution system, it can lease space on telephone poles and string its own cables, or it

can lease a distribution system installed and owned by a telephone company. *See Northwestern Ind. Tel. Co. v. FCC*, 824 F.2d 1205, 1207 (D.C.Cir.1987).

Century first attempted to gain access by leasing space on Pacific's poles. This request was refused by Pacific because Century had not obtained a valid franchise from the city of Palo Alto to provide cable service. Rather than seeking a franchise for itself from Palo Alto, Century sued Palo Alto, claiming that the city's exclusive franchising arrangement with Century's competitor CCC violated Century's first amendment rights. Century won that lawsuit, *see Century Federal, Inc. v. Palo Alto*, 648 F.Supp. 1465 (N.D.Cal.1986) and therefore currently has the right to provide cable service to the people of Palo Alto. Century could thus now presumably enter into a lease with Pacific for pole space.

Century is not, however, seeking access to Pacific's poles or distribution system in its petition to this court, but is instead attacking the access arrangements of its direct competitor. CCC chose the third option mentioned above for access to customers; it has entered into an agreement with Pacific whereby Pacific will construct and maintain cable television distribution facilities for CCC's exclusive use and lease them back to CCC.

█ Pacific has applied to the FCC, as required by 47 U.S.C. § 214(a), for permission to construct the facilities it needs to fulfill its contract with CCC.[1] Century challenges the adequacy of Pacific's application, contending particularly that Pacific failed to provide sufficient financial justification for its construction proposals. FCC regulations required Pacific to show how the proposed construction would serve the public interest, convenience, and necessity, 47 C.F.R. § 63.01 (1987), and to disclose the "[e]conomic justification for the proposed

---

1. Section 214(a) reads:

No carrier shall undertake the construction of a new line or of an extension of any line, or shall acquire or operate any line, or extension thereof, or shall engage in transmission over or by means of such additional or extended line, unless and until there shall first have

been obtained from the Commission a certificate that the present or future public convenience and necessity require.or will require the construction, or operation, or construction and operation, of such additional or extended line.... 

47 U.S.C. § 214(a) (1982).

project including ... estimated added revenues and costs and the basis therefor." 47 C.F.R. § 63.01(m) (1987). Pacific attached two tables as exhibits to its application, one setting out a summary of cost estimates for construction, the other showing expected annual revenues and expenses. It stated that annual revenues for the first fifteen years would recover its costs and yield a rate of return on investment slightly greater than 12.75%.[2] Rejecting Century's challenge to the adequacy of these submissions, the Commission's Common Carrier Bureau stated that the estimates appeared to be reasonable and that Century had not presented any evidence refuting them. Century would have this court require the FCC to impose a stricter standard upon applicants, but it is entirely within the Commission's discretion to accept even a minimal showing of financial justification, so long as the applicant meets each provision of the regulation. *See Nat'l Cable Television Ass'n v. FCC*, 747 F.2d 1503, 1508 (D.C.Cir.1984); *United States Satellite Broadcasting Co. v. FCC*, 740 F.2d 1177, 1185 (D.C.Cir.1984); *Hawaiian Tel. Co. v. FCC*, 589 F.2d 647, 654 n. 13 (D.C. Cir.1978).

█ Century also claims that Pacific's construction of the cable distribution system violates the FCC's cross-ownership rules. The FCC prohibits a telephone company from furnishing cable television to the public in the telephone company's telephone service area, either directly, or indirectly through an affiliated cable company. 47 C.F.R. § 63.54. Note 1(a) to section 63.54 of the rules defines the term "affiliate" to include "any financial or business relationship whatsoever by contract or otherwise, directly or indirectly between the carrier and the customer, except only the carrier-user relationship." *See Northwest-*

ern *Ind. Tel. Co.*, 824 F.2d at 1207; *Nat'l Cable Television Ass'n*, 747 F.2d at 1506. The term "affiliate" is defined so broadly as to preclude the business association between Pacific and CCC, but for the "carrier-user" exception. While the exact reach of that exception is not entirely clear, in the last few years the FCC seems to have materially enlarged it, allowing cable operators to finance construction of cable distribution systems by telephone companies and to accept some of the incidents of ownership of those facilities. *See Northwestern Ind. Tel. Co.*, 824 F.2d at 1209–10 & n. 6.

Century argues that the Commission has stretched the exception much too far in this case because Pacific, rather than only in a carrier-user relationship with CCC, actually controls CCC (which Century characterizes as merely an under-financed shell corporation). Century claims that Pacific is CCC's creditor, which under relevant FCC regulations would indicate a control relationship. That debtor-creditor relationship, according to Century, is embodied in the schedule of payments CCC has agreed to make to Pacific for use of the distribution network.[3] Under this schedule, Pacific will recover its costs for building the cable distribution system from CCC over a period of years. But the pertinent regulation states that "[e]xamples of situations in which a carrier and its customer will be deemed to be controlled ... include ... [w]here one is the debtor or creditor of the other (*except with respect to charges for communication services*)." 47 C.F.R. § 63.54 note 1(b) (emphasis added). Century's argument seems to be that installment payment plans necessarily create a debtor-creditor relationship, *and* that CCC's payments for use of Pacific's cable distribution network are *not* "charges for communications servic-

2. In an amendment to its application, Pacific submitted revisions of the two tables and a revised expected rate of return of between 10 and 11%.

3. Regarding this schedule, Century notes that in the eighth year, Pacific's estimated revenues increase by $12,000,000 and then, in year nine, return to the seventh year level. Century claims that the payments Pacific receives from CCC in years one through seven include a *de facto* loan

component which is paid back in year eight. We think the increase in year eight is a red herring; petitioner's theory reduces to the claim that all installment payments are loans. Whether the payment schedule is on a straight-line method or a modified straight-line with a balloon payment at the end or somewhere in the middle, it will still have an aspect of finance to it.

es." We think it clear, however, that these payments—whether or not they create a debtor-creditor relationship—are made for communications services, and so fall within the exception. While the FCC did not explicitly state this in its opinion, in a footnote concerning Century's affiliation argument it did single out Pacific's agreement to reschedule payments and to carry CCC's electrical power debt as examples of arrangements that did *not* fall within the carrier-user exception. This implies a determination that the installment payment plan *did* fall within the carrier-user exception, as a payment for communication services. "While we may not supply a reasoned basis for the agency's action that the agency itself has not given, *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947), we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974).[4]

▄ Century's final argument that the Commission's proceedings were tainted by *ex parte* contacts is plainly frivolous and should not have been raised on appeal. The "contacts" consist of two-page comments made to the Commission by the city of Palo Alto, CCC, and Heritage Communications in support of Pacific's application. The comments were mailed to the Commission prior to Century's intervention in the proceeding and were placed by the Commission in the public file. Century gives us no clue why these three entities had a duty to mail Century their comments *before* it became a party to the proceeding. And furthermore, as we stated in *Paragon Cable*, where a proceeding has not been desig-

nated for a hearing, Commission rules do not prohibit *ex parte* comments in any event. 822 F.2d at 156.

The petition for review is therefore *Denied.*

---

4. Century makes an additional, rather bizarre argument to support its claim that Pacific and CCC are affiliated. The Commission imposed a requirement that Pacific maintain separate books of account for its dealing with CCC in order to prevent any cross-subsidy between Pacific's telephone business and its cable distribution business, the danger being that Pacific might raise telephone rates if its cable venture turns out to be a losing proposition. Century contends that the imposition of this precautionary requirement by the Commission demonstrates that Pacific is affiliated with CCC. Cen-

tury is essentially attempting to bootstrap from the imposition of a precaution against cross-subsidy, where cross-subsidy itself would not necessarily indicate affiliation, to the fact of affiliation itself. We find this singularly unpersuasive and so we reject Century's contention that this routine provision, *see Wisconsin Bell, Inc.*, 56 Rad.Reg.2d (P & F) 1262, 1267–68 (CC Bur. 1984), *aff'd sub nom. Paragon Cable Television, Inc. v. FCC*, 822 F.2d 152 (D.C.Cir.1987); *Chesapeake and Potomac Tel. Co.*, 57 Rad.Reg.2d (P & F) 1003, 1008 (1985), is at all indicative of affiliation.