**TIME WARNER ENTERTAINMENT CO., L.P., Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

No. 97–1263.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 3, 1998.

Decided May 22, 1998.

R. Bruce Beckner argued the cause for petitioner, with whom Aaron I. Fleischman, Seth A. Davidson, and Jill K. McClelland were on the briefs.

James M. Carr, Counsel, Federal Communications Commission, argued the cause for respondents, with whom Joel I. Klein, Assistant Attorney General, United States Department of Justice, Robert B. Nicholson and Robert J. Wiggers, Attorneys, Christopher J. Wright, General Counsel, Federal Communications Commission, and Daniel M. Armstrong, Associate General Counsel, were on the brief.

Before: SILBERMAN, RANDOLPH, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Opinion concurring in part and dissenting in part filed by Circuit Judge RANDOLPH.

SILBERMAN, Circuit Judge:

Time Warner Entertainment Company petitions for review of an order of the Federal Communications Commission setting forth the manner in which cable system operators may recoup external cost increases incurred between September 30, 1992 and the date their system first became subject to rate

regulation. The Commission contends that because it had no opportunity to pass on the issue, or to correct its error, section 405 of the Communications Act bars our review. We grant the petition in part and remand.

## I.

The Cable Television Consumer Protection and Competition Act of 1992, Pub.L. No. 102–385, 106 Stat. 1460 (codified in scattered sections of 47 U.S.C.), directed the FCC to regulate the rates that cable operators not subject to "effective competition," defined at 47 U.S.C. § 543(*l*)(1) (1994), could charge their subscribers. The Commission designed a scheme intended to ensure that any system not facing such competition would nevertheless charge approximately the same rates as if it were in a competitive market. Put simply, a system operator's initial permitted rate either was its rate in effect on September 30, 1992 reduced by a "competitive differential" (the "full reduction rate"), or was calculated in accordance with certain FCC formulas and worksheets without reference to rates in effect on September 30, 1992 (the "transition rate"). *See* 47 C.F.R. § 76.922(b) (1997). Most systems, the Commission has said, employed the former rate. *See Implementation of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation, Memorandum Opinion and Order (Order on Remand)*, 11 F.C.C.R. 20206, ¶ 22 (1996).

In *Time Warner Entertainment Co. v. FCC*, 56 F.3d 151 (D.C.Cir.1995), we considered consolidated petitions for review of the FCC's orders implementing the Act. One of the cable operators' complaints in that case (and the only one relevant to Time Warner's instant petition) was that the FCC unreasonably did not allow "cable operators to adjust their rates to reflect external cost increases incurred during the gap period." *Id.* at 173.

"[E]xternal costs" were those "effectively beyond the cable operator's control," including: "(1) the retransmission consent fees cable operators pay to broadcasters; (2) programming costs; (3) [state and local] taxes; and (4) franchise fees and the costs associated with other franchise requirements, including the provision of public, educational, and governmental-access programming." *Id.* at 171; *see also* 47 C.F.R. § 76.922(f)(1) (1997). The "gap period" refers to the time between September 30, 1992 and the date a system became subject to rate regulation. An operator's initial permissible rate, at least for those using the full reduction rate, was derived from its rate in effect on September 30, 1992, *not* the actual rate in effect on the date each system became subject to regulation, "lest [the FCC] build into the permitted initial rates any unwarranted rate increases that cable operators took after passage of the 1992 Cable Act." *Time Warner*, 56 F.3d at 173. The Commission did not permit operators to recoup any external cost increases incurred during the gap period;[1] only those incurred *after* the date a system became subject to rate regulation could be taken into account.[2] The length of the gap varied among full reduction rate-based operators because they became subject to rate regulation at different times, but was no shorter than 11 and no longer than 17 months long.

In *Time Warner*, we held that the Commission's "decision to preclude a rate adjustment designed to recover changes in external costs incurred during the gap period [was] arbitrary and capricious," *id.* at 174, and "vacate[d] the rule insofar as the FCC denied [cable operators] recovery of their gap-period external cost increases." *Id.* at 178. In our view, the FCC had offered "no reason to doubt that cable operators incurred external costs during the gap period, yet under its regulations they would never be able to recoup those costs short of opting for cost-of-

1. The FCC's counsel, however, indicates that operators were permitted to include one particular external cost increase—franchise fees—incurred during the gap period.

2. Our first *Time Warner* opinion did not address whether a system operator which used a transition rate rather than a full reduction rate was subject to the same external cost adjustment problem, and the parties dispute the point. The FCC's counsel argues that such an operator did not. Time Warner, however, contends that an operator using the transition rate faced a slightly different gap, one that began on April 1, 1993 instead of September 30, 1992, but likewise ended on the date the system first became subject to rate regulation.

service regulation—which would be akin to shooting a fly with a blunderbuss." *Id.* at 174.[3] We also thought the Commission's defense of its rule—that allowing recovery of the gap-period external cost increases would be too administratively burdensome, both for the cable operators and the FCC—"completely unacceptable." *Id.*

Eighteen months after our decision, and without issuing a proposed rule or seeking public comment on how to proceed, the Commission issued an order in response to our remand. *See Order on Remand,* ¶¶ 21–28. The order "permit[s] operators to adjust their *current* permissible rates to [the level] the operators would currently be charging if they had been permitted to include increases in external costs occurring between September 30, 1992 and their initial date of regulation." *Id.,* ¶ 25 (emphasis added). But the Order does not allow cable operators to recover in future rates or otherwise the difference between the rates they would have charged in 1994, 1995, 1996, and 1997, had they been allowed to account for external cost increases incurred during the gap period, and their allowable rates in those years. Time Warner did not petition for reconsideration after the Commission issued its *Order on Remand;* it instead sought review here. Petitioner claims that the FCC's order unreasonably denies operators the ability to recoup the revenue deficiency—which Time Warner estimates at more than $14 million dollars—they sustained during the four years, and that the order does not comply with our mandate in the first *Time Warner* case. It also contends that those operators which employ a transition rate are unreasonably denied the opportunity to take advantage of the prospective relief afforded full reduction rate-based operators.

## II.

The Commission did not explain why its order permitted cable operators to charge current rates as if the gap period external cost increases had been included, but did not allow them to recover their revenue deficiencies, other than to say that "[t]he scope of relief requested is reflected in Time Warner's Emergency Motion for Expedited Review (May 3, 1994 ...)" filed *in this court* before argument on the first petition. *Id.,* ¶ 24 n. 40.. Petitioner had said in that motion that "cable operators lose millions of dollars in revenue every day. If they eventually succeed in persuading this Court to rule in their favor, those losses cannot be recouped. Their unrecoverable economic loss thus constitutes irreparable injury." The FCC construed that statement as a concession (or waiver) that the cable operators were not even seeking to recover their revenue loss.

Petitioner contends that it was absurd for the Commission to have drawn a distinction between past revenue deficiencies attributable to unrecovered external cost increases and prospective rates predicated on, but not totally recovering, those past external cost increases; its claim to the Commission never made that distinction.[4] Even worse, Time Warner argues, the passage on which the FCC relied pertained solely to the Commission's choice of a 17% "competitive differential," *see supra* at 77, not the gap period at all. The FCC's counsel insists that it was "entirely understandable" for the Commission to decide as it did because Time Warner never indicated that it had "changed" its position in a submission to the FCC after our remand, or in a petition for reconsideration. He contends that the other arguments Time Warner raises in its petition—that it was unreasonable for the Commission not to provide a way for operators to recoup all their revenue deficiencies, that the FCC's order treated full reduction rate-based operators more favorably than those using the transition rate, and that the order did not comply with our remand—were *never* presented to the Commission (presumably in a petition for

---

3. The rules permitted a system operator to opt into conventional cost-of-service regulation; we said, however, that "because a cost-of-service regulatory proceeding is expensive for the cable operator, the FCC can be confident that an operator will not lightly choose that option and it will indeed remain a limited exception to the general

rule." *Time Warner,* 56 F.3d at 170 (citation omitted).

4. The dissent's formulation of the issue, assertedly not presented to the Commission, *see* Dissent at 82, is misstated.

reconsideration because it was not foreseeable that the Commission would draw the remedial distinction that it did). Petitioner therefore has not exhausted its administrative remedies and our review is foreclosed by section 405(a) of the Communications Act. Time Warner's primary response is that the issues it raises were directly implicated in the reasoning of our prior decision and were therefore covered in the remand order.

Section 405(a) is worded somewhat differently than the normal exhaustion provision. It provides:

> After an order, decision, report, or action has been made or taken in any proceeding by the Commission ... any party thereto, or any other person aggrieved or whose interests are adversely affected thereby, may petition for reconsideration ... and it shall be lawful for ... the Commission ..., in its discretion, to grant such a reconsideration if sufficient reason therefor be made to appear.... The filing of a petition for reconsideration *shall not be a condition precedent to judicial review of any such order,* decision, report, or action, ex*cept where the party seeking such review* ... (2) *relies on questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass.*

47 U.S.C. § 405(a) (1994) (emphasis added). Although we have said that this provision codifies the normal exhaustion doctrine, *see Washington Ass'n for Television and Children v. FCC (WATCH),* 712 F.2d 677, 681 (D.C.Cir.1983), the text does not refer to the necessity of a party *raising* an argument before the Commission—as does the typical exhaustion statute—but only that the Commission have an "opportunity to pass" on a question of fact or law raised in the petition.[5]

In determining whether the Commission has had an opportunity to pass on a question, we have, to be sure, asked whether a question was adequately presented to the Commission even if the Commission addressed the issue in some fashion. Recently, for

instance, in *Bartholdi Cable Co. v. FCC,* 114 F.3d 274 (D.C.Cir.1997), we held section 405 was not satisfied because the party claiming the Commission improperly rejected attorney-client and work-product privileges had not raised those claims before the Commission. The FCC discussed the privileges in *dicta,* but we concluded that because the issue was not "flagged" the Commission did not have a *fair* opportunity to pass on it. *Id.* at 279–80. *Bartholdi Cable* thus fits within the category of cases in which we have said that even where an issue has been "raised" before the Commission, if it is done in a less than complete way, *see Northwestern Ind. Tel. Co. v. FCC,* 824 F.2d 1205, 1210 n. 8 (D.C.Cir.1987) (appellant "point[ed] out" a circumstance, but did not make an argument); *WATCH,* 712 F.2d at 681 (appellant "never explicitly" made its argument); *Alianza Federal de Mercedes v. FCC,* 539 F.2d 732, 739 (D.C.Cir.1976) (the "grist" of appellant's argument was there, but "nothing was made of it"), or if the party seeking review "seem[s] to abandon its argument ... by taking inconsistent positions," *Busse Broad. Corp. v. FCC,* 87 F.3d 1456, 1461 (D.C.Cir. 1996), the Commission has not been afforded a fair opportunity. Our reasoning reflects our experience as judges that unless an issue is squarely presented in a case, any discussion of the question in the opinion (*dicta*) is only a preliminary view and therefore not to be given precedential weight.

 Because section 405 is worded as it is, however, it is not necessary that the issue of fact or law be presented to the Commission by the petitioner itself. "There is no requirement that [the Commission's opportunity to pass] be afforded in any particular manner, or by any particular party." *Office of Communication of the United Church of Christ v. FCC,* 465 F.2d 519, 523 (D.C.Cir. 1972). Indeed, in *United Church of Christ* we held that since two dissenting Commissioners had raised the "very argument pressed" before us, section 405 was not an

---

**5.** Our dissenting colleague does not take account of this statutory distinction, and relies on "common law" exhaustion doctrine. But judge made notions of "common law" always yield to statutes—particularly in administrative law, *see Dar-*

*by v. Cisneros,* 509 U.S. 137, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993) and *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

impediment to review. *Id.* Nor have we required that the *precise* issue be presented to the Commission in order to afford it a "fair opportunity." So long as the issue is necessarily implicated by the argument made to the Commission, section 405 does not bar our review. For example, in *National Ass'n for Better Broadcasting v. FCC (NABB)*, 830 F.2d 270 (D.C.Cir.1987), the appellant complained to the Commission that a television station had violated the Communication Act's advertising rules. The FCC determined that the appellant's statutory claim was foreclosed by its 1974 policy statement interpreting the statutory requirements. We allowed the appellant to argue that the FCC's policy statement was contrary to the Act, although that exact argument was never presented to the Commission. We said that "the Commission not only understood that the gravamen of NABB's grievance was that [the station] was infringing [the Act], but the Commission actually purported to dispose of that charge in its order." *Id.* at 274. And in *MCI Telecommunications Corp. v. FCC*, 10 F.3d 842 (D.C.Cir.1993), MCI claimed that AT&T had violated a "reasonable charges" provision of the Act, and that it was therefore entitled to damages. The Commission, however, determined that its "IXC orders" barred damages. Because MCI never addressed the proper interpretation of its IXC orders, the FCC argued on appeal that it had been afforded no opportunity to pass on the question, so section 405 barred review. In accordance with our *NABB* decision, we said that "MCI's claim on review that the Commission decided [the] question [of whether it was entitled to damages] by invoking an authority inadequate to justify the decision does not itself raise a novel question of law; it merely asks whether the original question was correctly decided." *Id.* at 845.[6]

The Commission properly points to an apparently conflicting line of our cases in which we have been sticklers in insisting that "a party must first present its concerns to the Commission so that the agency is afforded an opportunity to cure any defect" and that the FCC must be given "the opportunity to ... correct any error" in its order as a precursor to judicial review. *See, e.g., Freeman Eng'g Assocs., Inc. v. FCC*, 103 F.3d 169, 182 (D.C.Cir.1997). But those are cases, as we explained, "where the challenge is predicated upon a *technical defect* in a Commission decision which could easily have been cured if called to the Commission's attention on reconsideration." *NABB*, 830 F.2d at 274 (emphasis added). It is in these "technical defect" or procedural oversight cases that we have made the statements about giving the agency an opportunity to correct errors. For example, in *Rogers Radio Communication Services v. FCC*, 593 F.2d 1225 (D.C.Cir. 1978), the appellant contended that the FCC failed, in violation of 47 U.S.C. § 309(a), to articulate its finding that a rival cellular carrier would serve the public interest, convenience, and necessity in granting the rival's application; we determined that "[o]ne of the purposes of [section 405] is to afford the Commission the initial opportunity to correct errors in its decision or the proceeding leading to decision." *Id.* at 1229. We said the same thing where the petitioners claimed the FCC violated the APA by failing to address comments in its rulemaking proceeding, *Action for Children's Television v. FCC*, 906 F.2d 752, 755 (D.C.Cir.1990); *see also Petroleum Communications, Inc. v. FCC*, 22 F.3d 1164, 1169–71 (D.C.Cir.1994) (FCC gave no opportunity for notice and comment before promulgating rule); *City of Brookings Municipal Tel. Co. v. FCC*, 822 F.2d 1153, 1163 (D.C.Cir.1987) (APA and other procedural objections); *American Radio Relay League v. FCC*, 617 F.2d 875, 879 n. 8 (D.C.Cir.1980) (notice and comment procedures), where a petitioner claimed the FCC ignored certain record evidence, *Freeman Eng'g*, 103 F.3d at 182; *see also Southern Ind. Broad. v. FCC*, 935 F.2d 1340, 1342 (D.C.Cir.1991) (appellant claimed a deposition that the FCC reviewed was not part of the record), and where an appellant claimed the Commission erroneously ascribed a rival applicant's research methods to it. *Gencom Inc. v. FCC*, 832 F.2d 171, 186–87 (D.C.Cir.1987); *see also Freeman Eng'g*, 103 F.3d at 182 (petitioner was required to present its claim that the FCC failed to explain why it treated a competitor's

---

6. The dissent ignores these three cases.

similar proposal differently to give the FCC "an opportunity to cure any defect"). *But cf. Alabama Power Co. v. FCC,* 773 F.2d 362, 368 & n. 12 (D.C.Cir.1985) (argument that Commission used "a wholly irrelevant percentage figure" to discount certain costs did not need to be raised in a petition for reconsideration).

■ To sum up, in our section 405 cases we have asked whether the issue that a petitioner brings to us was "flagged," or to use a sports metaphor, "teed up," before the Commission. But if petitioner complains of only a technical or procedural mistake, such as an obvious violation of a specific APA requirement, we have insisted that a party raise the precise claim before the Commission—if necessary, in a motion for reconsideration—because we assume the Commission simply overlooked the requirement. In those instances, we are concerned that the petitioner, by bringing the issue first to us, is playing a game of "gotcha." If, however, a petitioner makes a basic challenge to a Commission policy, but the formulation of the issue presented to us was not precisely as presented to the Commission, we ask whether a reasonable Commission *necessarily* would have seen the question raised before us as part of the case presented to it.

■ We think it a close question here whether our remand itself should be thought to have, at least, adequately presented to the Commission the "issue" of whether petitioner was entitled to fully recover the excluded gap period external cost increases. We never explicitly addressed the scope of the remedy, but the logic of our opinion—that it was unreasonable for the Commission to justify its refusal to permit cable operators to recover gap external cost increases on administrative burden grounds—applies equally to past losses and future ones. If the Commission had relied on a new consideration, other than the discredited administrative burden, that would be another matter, but it did not; it offered no reasoning beyond its "concession" rationale. Surely if the FCC had merely said that "we do not wish to grant full relief,

as the court's opinion suggests we should, because it might prove politically unpopular" or, because "we do not like petitioner," it could not be argued that a petition seeking review brought into question a truly new issue of law. On the other hand, we have warned that a party must be careful on remand to raise issues before the Commission before they come back to us. *See Illinois Bell Tel. Co. v. FCC,* 988 F.2d 1254, 1264 n. 12 (D.C.Cir.1993).[7]

It is unnecessary for us to decide whether our remand put the issue to the FCC, however. The Commission apparently recognized that the rationale of our decision did not easily support the distinction it wished to draw, and that petitioner's supposed "concession" allowed it to avoid confronting the problem. But there is no question that the Commission expressly decided the concession issue—whether petitioner was even seeking to recover its revenue deficiency. And, in that regard, we agree with petitioner that the FCC's interpretation of petitioner's motion for expedition filed in this court was a disingenuous gimmick used to avoid a principled response to our remand. (Indeed, as we have noted, it appears that the Commission took Time Warner's statement in its motion to expedite out of context.) The truth is that parties often claim that drastic harm will occur when seeking expedited consideration. But it is rather farfetched to interpret such predictions as consent to their imposition. In this case, we suspect petitioner was reflecting a natural fear that convincing the Commission to authorize cable operators to fully recover their past losses from consumers was a chancy proposition—at a minimum, that action is politically troublesome. It appears to us that by seizing upon Time Warner's purported concession, the Commission avoided addressing the scope of relief question in an unfair way. *Cf. Illinois Public Telecommunications Ass'n v. FCC,* 117 F.3d 555, 565–66 (D.C.Cir.1997) (rejecting FCC's argument that petitioner had abandoned its argument because the FCC had selectively quoted from petitioner's petition). We do

---

7. Given the apparent tension in our cases, a prudent counsel when in doubt should seek re-

consideration before the Commission.

not look sympathetically to the Commission playing "gotcha" either. The Commission had an opportunity to pass on the question of whether operators should be allowed to recover their revenue deficiencies, but chose to duck—its failure to address the point was not an accidental mistake.

■ Our view is different as to whether the Commission had a fair opportunity to consider Time Warner's argument that the *Order on Remand* unreasonably denied transition rate-based operators *any* recovery of their gap period external cost increases. Petitioner does not claim that it or any party ever raised this argument to the Commission, arguing again that our decision in the first case put this issue before the Commission. While that may have been true as to the scope of relief argument, our opinion did not even recognize a distinction between full reduction rate-based and transition rate-based operators, so it can hardly be said that our opinion put this second issue before the Commission. Indeed, our opinion only considered the problem as it affected the former class of operators. Nor is this issue necessarily implicated by petitioner's more general argument. As we noted above, *supra* note 2, Commission's counsel explains that transition rate-based operators' rates, set without reference to September 30, 1992, already reflect any external cost increases incurred during the gap period. Time Warner objects that this is a "post-hoc explanation," and argues that transition rate operators do have a gap, albeit a different one. But counsel's explanation is legitimate and persuasive as to why the Commission would not have thought this issue essential to resolving petitioner's more general complaint. Unlike the scope of relief question, we do not perceive that here the Commission was trying to avoid a vexing problem. It simply went unaddressed because the Commission apparently did not understand that it was an issue. Time Warner therefore should have raised it to the Commission in a petition for reconsideration.

\* \* \* \* \* \*

We grant the petition with respect to the scope of relief question. Because the Commission chose not to argue the merits in the alternative, we have no choice but to vacate the challenged portions of the order in so far as the Commission has not allowed full reduction rate operators to recover their revenue deficiencies. The remainder of the petition is denied.

*So ordered.*

RANDOLPH, Circuit Judge, concurring in part and dissenting in part:

Time Warner's claim—that the Federal Communications Commission should have allowed it to recoup external cost increases occurring during the so-called "gap" period—should not have been considered by this court.

Not once during the administrative and judicial proceedings leading up to this case did Time Warner make that claim, or a single argument in support of it—not during the original rulemaking, not in its first petition for review in this court, not in its motion for expedited consideration, not in its briefs in this court, not during the Commission's proceedings on remand, and not in a petition for administrative reconsideration. Our opinion in *Time Warner Entertainment Co. v. FCC*, 56 F.3d 151 (D.C.Cir.1995), said nothing on the subject, and for good reason. We usually do not pronounce on questions no one has presented.

After we remanded the case, Time Warner could have placed its claim and its supporting arguments before the Commission. Time Warner surely knew of the rules allowing this. *See* 47 C.F.R. § 1.1206 (1995). Yet during the ensuing eighteen months, while the case remained pending before the Commission, Time Warner chose to do nothing. We have held time and again, in cases involving this and other administrative agencies, that if a party does not raise and argue an issue before the agency, the court will not consider it. *See, e.g.,* the cases cited below. That "common law" or nonstatutory rule of exhaustion, a rule we also apply on appeals from the district court, is enough to preclude Time Warner's claim in this court. There is still another reason why we should not consider the claim. Even after the Commission issued its *Order on Remand,* Time Warner could have filed a motion for reconsideration.

Again, it chose to remain silent. Section 405 of the Communications Act therefore stands as an additional bar to judicial review of Time Warner's recoupment claim. In the words of §ᐧ 405, 47 U.S.C. § 405, the Commission had "no opportunity to pass" upon the "legal questions" raised by arguments Time Warner is now making for the first time in this court. Those legal arguments consist of analogies to Commission decisions dealing with the "Exchange Network Facilities for Interstate Access," to decisions of the Federal Energy Regulatory Commission allowing gas pipelines to impose retroactive surcharges, and so on. To state the obvious, the Commission never had a chance to pass on Time Warner's legal arguments concerning the agency's remedial discretion because Time Warner never presented those arguments to the Commission. "It is," we recently reiterated, "only through the adversarial process (or analogous circumstances) that the Commission is afforded such an opportunity within the meaning of § 405." *Bartholdi Cable Co. v. FCC,* 114 F.3d 274, 280 (D.C.Cir. 1997). We also stressed that it is not up to the Commission to "sift pleadings and documents" in an effort to predict what might have been argued if the litigant had taken the trouble to present the claim. *Id.* at 279; *see also, e.g., Russian River Vintage Broadcasting v. FCC,* 5 F.3d 1518, 1521 (D.C.Cir. 1993).[1]

The majority refuses to follow this well-marked path. Instead, it heads up a blind alley searching for a distinction between something called a "technical" defect and something described as a "policy" difference. *See* maj. op. at 80–81. As best I can make out, the majority thinks it has discovered a trend: litigants trying to raise "technical" defects in court without having raised them before the Commission will lose, but litigants raising "policy" differences for the first time in court, without having presented their arguments to the Commission, might just get away with it.[2]

So far as I can tell, this technical-policy trend winds up playing no discernible role in the outcome. Still, a few words about the majority's digression are in order. For starters, the distinction lacks any coherent rationale. The majority suggests that requiring a litigant to raise a procedural or "technical" point with the agency may allow the agency to correct its error before the case reaches the court. *See* maj. op. at 80–81. This is true, but it is also true about "policy" or "substantive" mistakes. Besides, as any student of administrative law knows, allowing an agency the chance to correct its errors is only one of many reasons behind the raise-it-or-waive-it rule. For instance, the "exhaustion doctrine recognizes the notion, grounded in deference to Congress' delegation of authority to coordinate branches of Government, that agencies, not the courts, ought to have primary responsibility for the programs that Congress has charged them to

---

1. The majority is quite mistaken in supposing that § 405 ousts the judicially-imposed requirement that parties present their claims to the Commission before the agency decides the matter. Maj. op. at 79 n.5. Section 405 deals only with petitions for agency reconsideration, which necessarily come after the Commission's decision. To read § 405 as the majority does *sub silentio* is to render it senseless: parties would be free to hide their contentions, to say nothing while the proceedings wind their way to a final agency decision, and then, only after the decision comes down, spring their arguments on the Commission and march into court when the Commission refuses to consider them. The courts of appeals do not allow anything of the sort. New arguments—that is, arguments that could have been made but were not—may not be raised in petitions for rehearing.

 Section 405 thus does not deal with the question whether, in order to have claims considered

on judicial review, parties must present those claims to the Commission *before* it renders its rulemaking or adjudicatory decision. In light of this statutory gap, the federal courts may fill in by insisting that if parties fail to raise their claims prior to final agency action, those claims will not be considered on judicial review. *McCarthy v. Madigan,* 503 U.S. 140, 144, 112 S.Ct. 1081, 1085–86, 117 L.Ed.2d 291 (1992), made this very point, adopting Justice White's statement in *Patsy v. Board of Regents of Florida,* 457 U.S. 496, 518, 102 S.Ct. 2557, 2568–69, 73 L.Ed.2d 172 (1982) (concurring in part), that "exhaustion is a 'rule of judicial administration,' ... and unless Congress directs otherwise, rightfully subject to crafting by judges." Here, Congress has not directed otherwise.

2. The majority suggests that exhaustion is entirely controlled by statute, *see* maj. op. at 79 n.5, and then contradicts itself by proposing a technical-policy distinction found in no statute.

administer." *McCarthy v. Madigan*, 503 U.S. 140, 145, 112 S.Ct. 1081, 1086–87, 117 L.Ed.2d 291 (1992); *see, e.g., McKart v. United States*, 395 U.S. 185, 192–95, 89 S.Ct. 1657, 1661–63, 23 L.Ed.2d 194 (1969). "Exhaustion concerns," the Supreme Court added, "apply with particular force when the action under review involves exercise of the agency's discretionary power or when the agency proceedings in question allow the agency to apply its special expertise." *McCarthy*, 503 U.S. at 145, 112 S.Ct. at 1086. In its brief, Time Warner treats the Commission's authority to allow recoupment as a matter of agency "discretion" and so the Court's words in *McCarthy* should have had particular force here. Of all things, remedial claims of the sort Time Warner raises in this court ought to be at the top of the list of items a litigant must first raise before the Commission.[3]

It is therefore hardly surprising that careful attention to our decisions reveals that the majority's technical-policy line does not exist. Take, for instance, *Petroleum Communications, Inc. v. FCC*, 22 F.3d 1164 (D.C.Cir. 1994), a case in which the petitioners claimed the Commission had failed to give notice and an opportunity to comment before promulgating a rule—a mere "technical defect" according to the majority. *See* maj. op. at 80–81. The majority seems to have forgotten the balance of the case. The *Petroleum Communications* petitioners also argued that the rule had been applied in a discriminatory fashion. *See Petroleum Communications*, 22 F.3d at 1171. Both claims were raised for the first time in the petition for review. We refused to reach the merits of *either* issue for "substantially the same reasons," namely that "petitioners failed to exhaust their remedies ... by declining to bring [the alleged error] first before the Commission." *Id.* To take another recent case, *Freeman Engineering Associates, Inc. v. FCC*, 103 F.3d

169, 182 (D.C.Cir.1997), treated a so-called "technical defect" (petitioner argued that the Commission failed to address certain record evidence) and an alleged substantive error (petitioner claimed the Commission treated him different than other similarly situated applicants) identically: the court held that both claims were waived because petitioner failed to raise them first before the Commission. In *Alianza Federal de Mercedes v. FCC*, 539 F.2d 732, 739 (D.C.Cir.1976), we held that the Commission had not been given a "fair opportunity" to pass on petitioner's argument, raised for the first time before this court, that a television station's broadcast license should not have been renewed because it offered a minimal amount of public interest programming devoted to minority community problems where minorities comprised 40% of the market. In *Washington Ass'n for Television & Children v. FCC*, 712 F.2d 677, 680–81 (D.C.Cir.1983), we held that § 405 precluded our considering the challenge to the Commission's license renewals on the ground that the television stations had provided inadequate weekday programming for children. In *Illinois Bell Telephone Co. v. FCC*, 988 F.2d 1254, 1264 n. 12 (D.C.Cir. 1993), we invoked the exhaustion doctrine to refuse to pass on allegations that the Commission had been "impermissibly inconsistent." In *Northwestern Indiana Telephone Co. v. FCC*, 824 F.2d 1205, 1210 n. 8 (D.C.Cir. 1987), we declined to reach the merits of petitioners' last minute argument that the Commission violated the First Amendment. Petitioners, we held, could not "bypass statutory exhaustion requirements." *Id.* And in *ASTV v. FCC*, 46 F.3d 1173, 1177 (D.C.Cir. 1995), we refused to consider ASTV's argument that "wireless cable *is* a 'cable system' under the Act, because ASTV failed to raise it before the Commission"—surely a substantive, "policy" matter rather than what the

---

3. *Darby v. Cisneros*, 509 U.S. 137, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993), cited by the majority in a footnote, *see* maj. op. at 79 n.5, has nothing to do with this case. *Darby* interpreted § 10(c) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), to mean that an "an appeal to 'superior agency authority' is a prerequisite to judicial review *only* when expressly required by statute or when an agency rule requires appeal before review and the administrative action is

made inoperative pending that review." 509 U.S. at 154, 113 S.Ct. at 2548. *See Marine Mammal Conservancy, Inc. v. Department of Agric.*, 134 F.3d 409, 411 (D.C.Cir.1998). No one is saying Time Warner should have, or could have, perfected an intra-agency appeal—the Commission rendered the decision under review and the Commission, of course, is the superior agency authority.

majority would treat as a mere "technical" peccadillo.

The majority ultimately comes to rest on grounds other than its technical-policy dichotomy. The Commission loses because it was playing something called "gotcha," it was "unfair," its view of the matter was "farfetched," it relied on a "disingenuous gimmick." Maj. op. at 81–82. All this excitement is directed at a footnote in the Commission's decision on remand. The footnote quoted a Time Warner motion conceding that cable operators could not recoup the losses they were incurring even if "they ultimately succeed in persuading this Court to rule in their favor," Memorandum of Law of Time Warner Entertainment Company, L.P. in Support of Its Emergency Motion for Expedited Consideration, at pp. 17–18. That concession directly contradicts Time Warner's current position. The Commission rightly took the statement in context: Time Warner was referring to the effect of delaying review of the entire "rate-regulation rulemaking." *Id.* at 17. "The truth is," according to the majority, "that parties often claim that drastic harm will occur when seeking expedited consideration." Maj. op. at 81. Maybe so, but that misses the point. If Time Warner believed that it was entitled to recoup its losses, if the company thought the question was still open despite what it told this court, it was incumbent upon Time Warner to make its views known to the Commission. It had ample opportunity to do so, not only while the matter was pending before the agency on remand, but also after the Commission handed down its decision. Time Warner nevertheless remained mute.

Pure and simple, the majority has offered no good reason for rejecting the Commission's determination not to decide a legal claim Time Warner neither raised nor supported with pertinent authorities. If "gotcha" and "disingenuous gimmick" are meant to embody a legal principle, I confess—the principle eludes me. I therefore dissent from this portion of the majority opinion.